# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
REBECCA UZELMEIER,                      )
                                        )
                     Plaintiff,         )
                                        )
          v.                            )          C.A. No. 07cv753 (PLF)
                                        )
UNITED STATES DEPARTMENT OF             )
HEALTH AND HUMAN                        )
SERVICES, et al.                        )
                                        )
                     Defendants.        )
_____)

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Rebecca Uzelmeier hereby moves this Court to enter partial summary judgment on Counts 2, 3 and 4 of her Complaint. As set forth in the attached Memorandum of Points and Authorities and Plaintiff's Statement of Material Facts Not in Genuine Dispute and Opposition to Defendants' Statement of Material Facts Not in Genuine Dispute, good cause exists for granting this motion. A proposed order is attached.

Respectfully submitted,


Stephen M. Kohn
D.C. Bar No. 411513

KOHN, KOHN & COLAPINTO, LLP.
3233 P Street, N.W.
Washington, DC 20007
Phone: (202) 342-6980
Fax: (202) 342-6984

Attorney for Plaintiff Rebecca Uzelmeier

Date: November 7, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

REBECCA UZELMEIER                          )
                                           )
        Plaintiff,                         )
                                           )
            v.                             )           Civil Action No. 07cv753
                                           )
                                           )
UNITED STATES DEPARTMENT OF                )
HEALTH AND HUMAN SERVICES, <u>et al.</u>   )
                                           )
        Defendants.                        )
_____)


**PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE
DISPUTE AND OPPOSITION TO DEFENDANTS' STATEMENT OF
MATERIAL FACTS NOT IN GENUINE DISPUTE**

Pursuant to Federal Civil Rule 56 and Local Civil Rules 7(h) and 56.1, Plaintiff,

Rebecca Uzelmeier, respectfully submits this statement of material facts as to which there

is no genuine dispute and her opposition to Defendants' statement of material facts not in

genuine dispute.


**PLAINTIFF'S OPPOSITION TO DEFENDANTS'
STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

Plaintiff responds to Defendants' factual assertions as follows:

1.      <u>Defendants' Fact Assertion Para. 1</u>:  Plaintiff, Rebecca Uzelmeier (formerly
Rebecca Marcus), was a Ph.D. candidate at Michigan State University (MSU) in the
Department of Pharmacology and Toxicology under the supervision of Professor Norbert
Kaminski. Complaint (Dkt. No. 1) at ¶ 9.

**Plaintiff's Response to Defendants' Para. 1**:

This paragraph is admitted.

1

2.    <u>Defendants' Fact Assertion Para. 2</u>:  On July 26, 1999, Professor Kaminski raised allegations of scientific misconduct against Plaintiff. Complaint at ¶ 10; MSU Investigative Report (MSU Report) (attached as Def. Exh. 4) at 1.

**<u>Plaintiff's Response to Defendants' Para. 2</u>**:

This paragraph is admitted.

3.    <u>Defendants' Fact Assertion Para. 3</u>:  On or about July 15 or July 16, 1999, Plaintiff was observed removing several items from the office in the MSU laboratory where Plaintiff worked. Def. Exh. 8 at Supplemental Report dated 7-28-99.

**<u>Plaintiff's Response to Defendants' Para. 3</u>**:

This paragraph is denied as inaccurate, incomplete, and hearsay without

foundation.  There is no indication of who did the observing, nor what was removed.

Furthermore, there was absolutely no prohibition on Ms. Uzelmeier's removal of

academic materials from MSU.  Any insinuation of wrongdoing is completely without

merit.  Ms. Uzelmeier learned that her files had been tampered with or were already

missing and she took them for safekeeping to an independent attorney.  Plaintiff's Exhibit

("Pl.'s Ex.") 1, Affidavit of Rebecca Uzelmeier ("Uzelmeier Off.") ¶ 49.  At Uzelmeier's

direction, all the files were returned to the university during the course of the proceeding.

*Id.* at ¶ 50.

4.    <u>Defendants' Fact Assertion Para. 4</u>: On July 15, 1999, Plaintiff filed a police report with the MSU Police Department claiming that research information was taken from her office in the MSU laboratory. Def. Exh.8.

**<u>Plaintiff's Response to Defendants' Para. 4</u>**:

This paragraph is admitted.

5. <u>Defendants' Fact Assertion Para. 5</u>: On August 2, 1999, Jeffrey Green, an attorney retained by Plaintiff, contacted the MSU Police Department and informed the

investigating officer that the reported filed by Plaintiff was unfounded. Def. Exh. 8 at Supplemental Report dated 8/2/99.

**Plaintiff's Response to Defendants' Para. 5**:

This paragraph is denied. Attorney Green never informed the MSU Police Department that Uzelmeier's police report was "unfounded." Pl.'s Ex. 2 (Jeff Green Aff.) ¶ 6. Uzelmeier never told him, or anyone, that the report was unfounded. Pl.'s Ex. 1 (Uzelmeier Aff.) ¶ 48. The report was not unfounded. *Id*. at ¶ 48. Attorney Green withdrew the police report to pursue the allegations elsewhere. Pl.'s Ex. 2 (Jeff Green Aff.) ¶ 7.

6.    Defendants' Fact Assertion Para. 6: On October 11, 1999, Jeffery Green, an attorney retained by Plaintiff, returned several notebooks containing research information reported by Plaintiff to be taken from her office in the MSU laboratory. Def. Exh. 3 at Findings of Misconduct ¶ IV.A.24 (p. 5).

**Plaintiff's Response to Defendants' Para. 6**:

This paragraph is denied. Attorney Green returned files that Uzelmeier had given to him for safekeeping, not files taken from Uzelmeier's office. Pl.'s Ex. 1 (Uzelmeier Aff.) ¶ 49.

7.    Defendants' Fact Assertion Para. 7:  On March 17, 2000, MSU issued a "Report of Assessment of an Allegation of Misconduct in Research Against Ms. Rebecca Marcus, Ph.D. Student, Department of Pharmacology and Toxicology" recommending that MSU proceed to an Inquiry. Def. Exh. 4 at 4-6.

**Plaintiff's Response to Defendants' Para. 7**:

This paragraph is admitted.

8.    Defendants' Fact Assertion Para. 8:  On September 18, 2000, an MSU Inquiry Panel found that the evidence was "sufficient, credible, and of such merit that an Investigative Committee could reasonably conclude that Misconduct occurred, and that an Investigation is therefore warranted." Def. Exh. 4 at 6.

**<u>Plaintiff's Response to Defendants' Para. 8</u>**:

      This paragraph is admitted in part and denied, in part, as incomplete.  Although

the Inquiry Panel made this preliminary finding, the finding only related to cause for a

formal investigation, and was not a finding of misconduct.

9.      <u>Defendants' Fact Assertion Para. 9:</u>  In its final report dated March 5, 2002, the MSU Investigative Committee found that Plaintiff "committed Misconduct in research." Def. Exh. 4 at 49.

**<u>Plaintiff's Response to Defendants' Para. 9</u>**:

      This paragraph is admitted.

10.      <u>Defendants' Fact Assertion Para. 10:</u>  In a Charge Letter dated September 6, 2006, the Office of Research Integrity (ORI) notified Plaintiff of its proposed findings of misconduct in science against her based upon the MSU Report and additional analysis and information obtained by ORI during its oversight review of the MSU Report. Charge Letter and Findings of Misconduct (ORI Charge Letter) (attached as Def. Exh.3).

**<u>Plaintiff's Response to Defendants' Para. 10</u>**:

      This paragraph is admitted in part and denied on the basis of hearsay.  In regard to

the letter dated September 6, 2006, plaintiff admits that such a letter was sent and

received by the plaintiff and that said letter contained the allegations set forth in Para. 9.

However, ORI never produced the complete factual record upon which this Charge Letter

was based.  Pl.'s Ex. 1 (Uzelmeier Aff.) ¶ 32.  Furthermore, ORI never sought

Uzelmeier's input on the so-called "additional analysis and information" it obtained.  *Id.*

at ¶ 26.

11.      <u>Defendants' Fact Assertion Para. 11:</u>  On or about October 11, 2006, Plaintiff filed a Request for Hearing to contest ORI's proposed findings of misconduct and proposed debarment. Request for Hearing (attached as Def. Exh. 5).

**Plaintiff's Response to Defendants' Para. 11**:

      This paragraph is admitted.

12.    Defendants' Fact Assertion Para. 12:  On October 19, 2006, ORI filed a motion to dismiss Plaintiff's Request For Hearing, alleging that Plaintiff failed to raise a genuine issue of material fact or law that could be properly addressed in a hearing. Motion to Dismiss Respondent's Hearing Request With Prejudice (attached as Def. Exh. 6).

**Plaintiff's Response to Defendants' Para. 12**:

      This paragraph is admitted.

13.    Defendants' Fact Assertion Para. 13: On November 9, 2006, Plaintiff filed an Opposition to ORI's motion. Mrs. Uzelmeier's Opposition to Dismiss Respondent's Hearing Request (attached as Def. Exh. 7).

**Plaintiff's Response to Defendants' Para. 13**:

      This paragraph is admitted.  However, defendants' ignored two prior filings by

Ms. Uzelmeier which impacted on the merits of this Opposition. On October 30, 2006,

Ms. Uzelmeier also filed a motion to dismiss HHS' proposed debarment, or for leave to

supplement her hearing request (as provided for in HHS research misconduct

regulations).  Motion to Dismiss and Request to Supplement (attached as Pl.'s Ex. 3)

These motions were briefed by both parties.  They were never ruled on.  Defs.' Ex. 2.

14.    Defendants' Fact Assertion Para. 14:  In a decision dated March 5, 2007, Carol Conrad Hughes, the HHS Departmental Appeals Board (DAB), Administrative Law Judge (ALJ), determined that Plaintiff's request for a hearing did not raise a genuine dispute of fact or law and therefore, dismissed Plaintiff's hearing request. "Dismissal of Respondent Uzelmeier's Hearing Request," *Office of Research Integrity v. Rebecca Uzelmeier*, Case No. C-07-32 (2007) (attached as Def. Exh. 2).

**Plaintiff's Response to Defendants' Para. 14**:

      Without concession as to the merits of the DAB ruling, this paragraph is admitted as a matter of procedural fact.

15.    <u>Defendants' Fact Assertion Para. 15</u>:  Based upon the denial of Plaintiff's hearing request, ORI's proposed findings of research misconduct and the HHS Debarring Official's proposed five-year debarment of Plaintiff became final, effective March 12, 2007. Notice of Debarment (attached as Def. Exh. 1).

**Plaintiff's Response to Defendants' Para. 15**:

This paragraph is admitted.


16.    <u>Defendants' Fact Assertion Para. 16</u>:  On April 25, 2007, Plaintiff filed the present civil complaint. Complaint (Dkt.No. 1).

**Plaintiff's Response to Defendants' Para. 16**:

This paragraph is admitted.


## <u>PLAINTIFF'S STATEMENT OF MATERIAL FACTS<br>NOT IN GENUINE DISPUTE</u>

1.  In 1999, Mrs. Rebecca Uzelmeier (then Ms. Rebecca Marcus) was a Ph.D. candidate at Michigan State University ("MSU") in the Department of Pharmacology and Toxicology, under the supervision of Professor Norbert Kaminski ("Professor Kaminski").  Pl.'s Ex. 1 (Uzelmeier Aff.) ¶¶ 1-2.

2.  Ms. Uzelmeier had a number of major differences with Kaminski.  Pl.'s Ex. 1 (Uzelmeier Aff.) ¶ 3.

3.  In or about the summer of 1999, Kaminski accused Ms. Uzelmeier of misconduct and had filed charges against her with MSU's Intellectual Integrity Officer.  *Id*. at ¶ 3.

4.  In or about July 1999, MSU launched an investigation into the Kaminski allegations.  *Id*. at ¶ 4.

5. On August 12, 1999, MSU informed HHS of Kaminski's allegations. Defs.' Ex. 3 at ORI Findings at 2.

6. Due to the nature of the allegations, Ms. Uzelmeier needed expert testimony to rebut them.  Pl.'s Ex.1 (Uzelmeier Aff.) ¶ 5.

7. Without strong corroborating independent expert testimony, MSU would not take a graduate student's word over a professor's.  *Id.* at ¶ 6.

8. Retaining an independent expert was also critically needed in order to provide scientific evidence to support Ms. Uzelmeier's credibility and permit her to assemble support for her position.  Defs.' Ex. 5 at 7.

9. Ms. Uzelmeier contacted Dr. Frederic Whitehurst in order to retain an expert.  Dr. Whitehurst has a Ph.D. in Chemistry from Duke University, a J.D. from Georgetown University, and had worked as an FBI agent and as a scientist within the FBI crime lab.  Dr. Whitehurst was running a Forensic Justice Project, in which he incorporated his scientific skills with his law enforcement background. He also was in a position to retain other scientists, should specialized information be needed to conduct a credible analysis.  Pl.'s Ex. 1 (Uzelmeier Aff.) ¶ 7.

10. Dr. Whitehurst agreed to be retained as Ms. Uzelmeier's independent expert.  *Id.* at ¶ 8.

11. In or about October of 1999, Ms. Uzelmeier requested that Dr. Whitehurst have full access to investigate the lab, its equipment, and to talk with witnesses.  The MSU investigation relied on these sources as the basis of the allegations against her.  *Id.* at ¶ 9.

7

12. MSU refused to grant this request, and refused to grant two subsequent requests. *Id.* at ¶¶ 9-10.

13. MSU rejected Ms. Uzelmeier's request for an outside expert in order to avoid embarrassment to the University and/or Professor Kaminski, expecting that an independent expert team would find problems with Kaminski. In its report, MSU admitted that bringing in the Whitehurst Team "could very well have the effect of punishing Professor Kaminski for making the allegations of scientific misconduct against Ms. Marcus. The punishment would take [sic] the effect of further disrupting the activities of his laboratory." *Id*. at ¶ 11, Defs.' Ex. 4b at 49.

14. Uzelmeier wanted to retain an expert in order to rebut the allegations leveled against her by a powerful professor, not to "punish" that professor. Pl.'s Ex. Uzelmeier Aff. ¶ 12.

15. MSU blocked Uzelmeier's requests to retain an expert to review the evidence the University was compiling against her. *Id*. at ¶ 13.

16. Dr. Whitehurst's team included a quality assurance expert who would have reviewed MSU's quality assurance documentation program to see whether it was in compliance with MSU's obligations under federal law. MSU did not want any oversight review of its document control system. *Id*. at ¶ 14.

17. MSU had no system to protect the integrity of documents, nor any security over documents, nor any way of monitoring access to the documents. MSU's flawed quality assurance documentation program was unquestionably one of the root causes of the controversy concerning issues with Ms. Uzelmeier's documentation. *Id*. at ¶ 15.

18. After MSU rejected Uzelmeier's request for an outside expert, it continued to conduct an investigation. Its "investigation was" required to be completed within 120 days. Defs.' Memorandum of Points and Authorities at 21 n.10. However, MSU would request numerous extensions of time and dragged out the Investigation for over two years.

19. It became obvious that MSU would not complete its review in a timely fashion and that Uzelmeier's career in science was effectively over. Without a prompt rebuttal of Kaminski's allegations, the issues raised by him would linger on, placing Ms. Uzelmeier in limbo. Pl.'s Ex. 1(Uzelmeier Aff.) ¶ 17.

20. If Kaminski's allegations were not promptly dismissed, the badmouthing that would inevitably arise within any scientific community in which Uzelmeier might seek employment would effectively render her unemployable. *Id*. at ¶ 18.

21. Uzelmeier's expectation that MSU would take years to complete its review was well founded. In fact, MSU took over two and-a-half years to issue its report. Def.s' Ex. 3 at ORI Findings at 1-3.

22. Because Ms. Uzelmeier believed that MSU would not conduct a fair investigation, and because of the impact of the MSU allegations on her career in science, Ms. Uzelmeier voluntarily withdrew from MSU in 1999. Pl.'s Ex. 1 (Uzelmeier Aff.) ¶ 20.

23. Ms. Uzelmeier was not expelled from MSU. The notice on the HHS website stating that she was expelled is not accurate and further harms her reputation. *Id*. at ¶ 21.

24. That MSU released inaccurate information about Ms. Uzelmeier's academic standing to an outside party is surprising, because it has continuously refused to release Ms. Uzelmeier's academic transcript to her. *Id*. at ¶ 22.

25. At the end of 1999 Ms. Uzelmeier made the decision to move on with her life and put the events from MSU behind her. *Id*. at ¶ 23.

26. By the end of 1999, Ms. Uzelmeier made the painful decision to leave the sciences and start a new career. *Id*. at ¶ 24.

27. Ms. Uzelmeier withdrew from the graduate program at MSU in 1999 and did not receive her Ph.D. She has not subsequently obtained any other science-related degrees or licenses. *Id*. at ¶ 41.

28. By March of 2002, when MSU finally completed its investigation into Uzelmeier's alleged misconduct of 1999, she had left the sciences, severed all connections with the scientific community, and begun a new career as a financial analyst. *Id*. at ¶ 42.

29. After leaving MSU, Ms. Uzelmeier married her current husband and had one child. *Id*. at ¶ 43.

30. Ms. Uzelmeier does not work in a science-related field and does not intend to do any science-related work in the future. *Id*. at ¶ 44.

31. Ms. Uzelmeier has never applied for or received a government grant or contract and has no intention of doing so in the future. Since leaving MSU, she has not been involved with any HHS committees or projects, nor does she have any interest or intention of doing so in the future. *Id*. at ¶ 45.

32. Since leaving the Ph.D. program at MSU, Ms. Uzelmeier has not worked as a federal contractor or knowingly received payment, directly or indirectly, from a government grant, nor does she intend to do so in the future. *Id*. at ¶ 46.

33. As a result of Ms. Uzelmeier's decision to withdraw from MSU and abandon her career in the sciences, Ms. Uzelmeier has no science-related licenses, no professional credentials which would qualify her for an HHS grant or to serve as a principal investigator on any grant proposal. Defs.' Ex. 5 at 2.

34.   As a result of Ms. Uzelmeier's decision to withdraw from MSU and abandon her career in the sciences, Ms. Uzelmeier has no intention of ever applying for work on a project sponsored by a government grant or contract. *Id*.

35. Ms. Uzelmeier has never been indicted or convicted of any crime. *Id* at 3.

36. After leaving MSU, Ms. Uzelmeier has never been accused of any ethical violations or any criminal charges. *Id* at 2.

37. As a result of Ms. Uzelmeier's decision to withdraw from MSU and abandon her career in the sciences, Ms. Uzelmeier is not a "threat" to ever seek any government grants or contracts in the future. *Id* at 3.

38. On or about September 12, 2006, more than seven years after HHS learned of the alleged misconduct, Ms. Uzelmeier received notification from ORI that it proposed a "finding of misconduct in science against [her] based upon accumulated evidence including the MSU Report, dated March 5, 2002, and additional analysis and information obtained by ORI during its oversight review of the MSU Report."  Pl.'s Ex. 1 (Uzelmeier Aff.) ¶ 25, Defs.' Ex. 3 at ORI Charge Ltr. at 1.

39. ORI never sought Ms. Uzelmeier's input on the so-called "additional analysis and information" it had obtained.  Pl.'s Ex. 1 (Uzelmeier Aff.)  ¶ 26.

40. As a result of ORI's findings, the Debarring Official proposed debarring Ms. Uzelmeier for a period of five (5) years.  Id. at ¶ 27, Defs.' Ex. 3 at ORI Charge Ltr. at 2.

41. On or about September 14, 2006, pursuant to the Privacy Act, 5 U.S.C. § 552a(d), Ms. Uzelmeier requested that HHS provide her with a copy of "all documents referenced in the charge against Rebecca Uzelmeier, dated September 6, 2006, but which were not attached to said charge."  Pl.'s Ex. 1 (Uzelmeier Aff.) ¶ 28, Pl.'s Ex. 4 (at Sept. 14, 2006 Request) p. 3.

42. On or about September 19, 2006, Ms. Uzelmeier asked HHS to provide her with a copy of "the complete administrative record relied upon by the HHS as the basis for filing the debarment charge against Rebecca Uzelmeier… as quickly as possible." Pl.'s Ex.1 (Uzelmeier Aff.) ¶ 29, Pl.'s Ex. 4 (at Sept. 19, 2006 Request) p. 4.

43. HHS presently has these records in its possession, but has refused to comply with either of Ms. Uzelmeier's requests for copies of her records.  Ms. Uzelmeier has never received a copy of the administrative record relied upon by HHS to support its debarment action.  Pl.'s Ex. 1(Uzelmeier Aff.) ¶ 32.

44. Ms. Uzelmeier wanted these documents because they form part of the actual basis for the proposed debarment.  She wanted to review not just the report, but all of the documents which formed the basis of that report.  She also wanted to provide this information to an expert witness in order to fully and finally offer a complete

rebuttal to the allegations raised by MSU and the additional allegations raised by ORI. *Id.* at ¶ 30.

45. It was Ms. Uzelmeier's firm belief that access to these materials was absolutely imperative so she could retain an expert and prepare a complete defense. *Id.* at ¶ 31.

46. HHS refused both of these requests. Because of these refusals, Ms. Uzelmeier's ability to rebut the allegations against her was severely prejudiced. *Id.* at ¶ 32.

47. On or about October 11, 2006, pursuant to 42 C.F.R. §§ 93.500 and 93.501, Ms. Uzelmeier timely filed a response and re quested an administrative hearing to review the proposed debarment. In her response, Ms. Uzelmeier contested each of the allegations raised against her. Defs.' Ex. 5.

48. On October 30, 2006 Ms. Uzelmeier timely requested leave to file a supplemental answer in order to have time to obtain the full record and have that record reviewed by an expert. Uzelmeier Aff. ¶ 33; Pl.'s Ex. 3 (Motion to Dismiss and Request to Supplement) pp. 1, 9-13.

49. Ms. Uzelmeier again retained Dr. Whitehurst as an expert witness and he informed her that he was available to conduct the review. Pl.'s Ex. 1 (Uzelmeier Aff.) ¶ 34.

50. The motion to supplement was filed pursuant to 42 C.F.R. § 93.501(d). Pl.'s Ex. 3 (Motion to Dismiss and Request to Supplement) pp. 1, 9-13.

51. On October 30, 2006,Ms. Uzelmeier also filed a Motion to Dismiss HHS's Proposed Debarment, on the basis that debarring Ms. Uzelmeier would not serve

the public interest, the debarment proceeding was stale, and that Ms. Uzelmeier

was not longer a threat to the taxpayer. *Id* at 1-9.

52. On or about March 5, 2007, the HHS Departmental Appeals Board (DAB) issued

an opinion dismissing Ms. Uzelmeier's hearing request on the grounds that she

failed to "meet the regulations' specificity requirements," or "raise a genuine

issue of material fact or law that may be properly addressed in a hearing." Defs.'

Ex. 2 at 1.

53. However, the DAB at no time ruled on or even acknowledged Ms. Uzelmeier's

motion to dismiss or her motion to supplement her hearing request.  *Id.*

54. ORI subsequently sent Ms. Uzelmeier a letter, dated March 12, 2007, stating that

"[a]s a result of this decision, the Office of Research Integrity's findings of

research misconduct and proposed 5-year debarment period are now final." Defs.'

Ex. 1 at 3, Pl.'s Ex. 1 (Uzelmeier Aff.) ¶ 36.

55. Being debarred has a profound impact on Ms. Uzelmeier's life.  In addition to the

humiliation and damage to her reputation, debarment may have a negative impact

on the progression of her current career.  *Id.* at ¶ 37.  The public record created by

the debarment action harms Ms. Uzelmeier in her non-government related work.

Defs.' Ex. 5 at 3.

56. Employers may be reluctant to hire a debarred person, especially one accused of

the types of allegations leveled at Ms. Uzelmeier by MSU and ORI.  Pl.'s Ex. 1

(Uzelmeier Aff.)  at ¶ 38.

57. Furthermore, Ms. Uzelmeier risks being denied professional designations and

license renewals because of her status as a debarred person—in particular, she

risks being denied the Certified Financial Planner designation, a critical

designation in her field.  *Id.* at ¶ 39.

58. The debarment has harmed her reputation and is public information on the World

Wide Web.  *Id.* at ¶ 40.

59. Ms. Uzelmeier brings this action for judicial review of HHS's final decision to

debar her.

60. Throughout MSU's investigation, Ms. Uzelmeier has maintained that she had

committed no wrongdoing. Pl.'s Compl. at 6.


                                        Respectfully submitted,


                                        Stephen M. Kohn
                                        D.C. Bar No. 411513

                                        KOHN, KOHN & COLAPINTO,
                                        LLP.
                                        3233 P Street, N.W.
                                        Washington, DC 20007
                                        Phone: (202) 342-6980
                                        Fax: (202) 342-6984

                                        Attorney for Plaintiff Rebecca
                                        Uzelmeier

Date: November 7, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
REBECCA UZELMEIER,                        )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )        C.A. No. 07cv753 (PLF)
                                          )
UNITED STATES DEPARTMENT OF               )
HEALTH AND HUMAN                          )
SERVICES, et al.                          )
                                          )
                    Defendants.           )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

     This is an appeal of a March 12, 2007 decision by the Department of Health and Human

Services ("HHS") to debar from all federal contracting Plaintiff Rebecca Uzelmeier for five

years.   On August 20, 2007, Defendants filed a Motion to Dismiss and/or for Summary

Judgment of the April 24, 2007 Complaint filed by the plaintiff in this case.  Ms. Uzelmeier

hereby files her Memorandum and Points of Authority in Opposition to Defendants' Motion and

in Support of Her Cross-Motion for Summary Judgment.

**STATEMENT OF THE CASE AND FACTUAL SUMMARY**

     During the 1998-99 academic school year, Plaintiff Rebecca Uzelmeier (Ms. Uzelmeier

was not yet married and her surname was Marcus) was a graduate student at Michigan State

University ("MSU" or "University") enrolled in a Ph.D. program in Pharmacology and

Toxicology.  Plaintiff's Statement of Material Facts Not in Genuine Dispute and Opposition to

Defendant's Statement of Material Facts (hereinafter, "PSMF") ¶ 1.

Ms. Uzelmeier has never worked as a government contractor, never applied for a government grant or contract, and has never been awarded any grant or contract. *Id.* at ¶ 31.

On July 26, 1999, MSU commenced formal academic misconduct proceedings against Ms. Uzelmeier after her advisor, Professor Norbet Kaminski ("Kaminski"), filed "Allegations of Misconduct in Research against Rebecca M. Marcus." *See,* Defendants' Exhibit ("Defs.' Ex.") 4a at 1,4.

On August 12, 1999 MSU formally notified the Department of Health and Human Services' ("HHS") Office of Research Integrity ("ORI") of the allegations filed against Ms. Uzelmeier. Defs.' Ex. 3 at ORI Findings at 2.

MSU conducted an internal investigation of this matter, with the knowledge of ORI, and filed a final ("draft") report on the matter, executed on March 5, 2002. (Attached as Defs.' Ex. 4.) MSU concluded that Ms. Uzelmeier "committed misconduct in research." *Id.* at 49-50. The University's basis for accusing Ms. Uzelmeier of fraud against the United States was its statement that a "grant application to support" continued research on the areas related to Ms. Uzelmeier's research had to be "withdrawn" and that the University used federal funds to investigate the allegations against Ms. Uzelmeier and "retrace[]" her "steps to determine which of her findings could be trusted." *Id.* There was no allegation that Ms. Uzelmeier filed a fraudulent grant application, was ever a direct applicant for or recipient of any government funds, or that she ever worked or even was qualified to be a principal investigator under an HHS grant or contract. All of the allegations stemmed from her work as a graduate student, and were filed by her faculty advisor.

Prior to the Kaminski allegation, Ms. Uzelmeier had *never* been accused (let alone convicted) of any academic or research misconduct or ethical misconduct or crime. After the

MSU incident, Ms. Uzelmeier was never again accused or convicted of any academic misconduct, ethical infraction or criminal conduct.

After she was formally accused of misconduct, Ms. Uzelmeier retained scientific experts under the direction of Dr. Frederic Whitehurst. Defs.' Ex. 4 at 48-49; PSMF ¶ 10. Dr. Whitehurst was forensic scientist with years of experience within the FBI crime laboratory. He had a Ph.D. in Chemistry from Duke University. PSMF ¶ 9. Given the nature of the allegations filed against Ms. Uzelmeier, she needed outside expert testimony in order to credibly conduct an independent review of the University's evidence and rebut the charges against her. *Id.* at ¶ 6. The University blocked her request to have the Whitehurst team conduct this independent review on three separate occasions. *Id.* at ¶¶ 11-12. The independent review was never permitted. *Id.* at ¶ 15.

In its final report, MSU acknowledged that Ms. Uzelmeier had requested the independent review so she could prepare an "adequate defense" of the allegations against her and "ascertain[] the truth" as to what had occurred with her research. Defs.' Ex. 4b at 48. MSU explained why it blocked Ms. Uzelmeier's repeated requests for an expert review as follows:

> [T]he Investigative Committee cannot see how bringing in the Whitehurst Team could have helped the Investigative Committee carry out its charge. Instead, it could very well have the effect of punishing Professor Kaminski for making the allegations of scientific misconduct against Ms. Marcus. The punishment would take the effect of further disrupting the activities of his laboratory.

*Id.* at 49.

Neither MSU nor ORI have ever explained how or why an independent review by scientific experts retained by Ms. Uzelmeier could have, in any manner whatsoever, resulted in "punishing Professor Kaminski." The argument that experts hired by Ms. Uzelmeier could not

have "helped the Investigative Committee" was refuted by the actions of that Committee, which retained its own University-sponsored expert to review various materials.  Defs.' Ex. 4a at 30.

Under the regulations in existence at the time, MSU was required to complete its investigation of Ms. Uzelmeier within 120 days.  MSU did not complete its investigation in a timely manner, obtaining numerous extensions of time from ORI to complete its review. Defs.' Mem. P. & A. at 21, n.10.   Ms. Uzelmeier vigorously complained about the delay, both in the University's completion of the review and in providing her data in a timely manner. Defs.' Ex. 4b at 48.

ORI was even slower in reviewing this matter.  Despite having access to the complete MSU report and work product prepared by MSU, ORI delayed taking any action against Ms. Uzelmeier for over *four additional* years.  By letter dated September 6, 2006, seven years after first learning of the allegations against Ms. Uzelmeier, ORI proposed debarring Ms. Uzelmeier. Defs.' Ex. 3 at ORI Charge Ltr. at 2.[1]

During the seven-years that transpired between Kaminski's allegations of misconduct and ORI's letter of proposed debarment, Ms. Uzelmeier had transformed her personal life, her professional priorities and her career.  At the time her advisor filed the charges against her, Ms. Uzelmeier was a single, 27 year-old graduate student.  She had no advanced professional degree and no professional licenses.  Any potential career in the sciences (including any career that

---

[1]    In their Memorandum in support of their pending Motion to Dismiss, Defendants state: "If Plaintiff would have agreed to voluntary exclusion prior to the issuance of the charge letter in November [sic] 2006, the voluntary exclusion would have obviated the need for a formal debarment of Plaintiff.  However, Plaintiff refused to sign a document agreeing to a voluntary exclusion." Defs.' Mem. P. & A. at 18, n.8.  *See also id.* at 21.  Settlement discussions are immaterial to this case and all such references should be struck from the record.  However, for the record, all of HHS' settlement offers were predicated on Ms. Uzelmeier's making admissions she has always maintained were untrue, and on permitting government publication of highly derogatory information that would have resulted in inappropriate punishment.  HHS never offered a simple, voluntary exclusion.

might have resulted in her being potentially eligible for an HHS grant or contract) was dependent upon her completing her degree and upon the references she would obtain from her professors.

Based on the allegations filed against her, and her estimation of the time and cost involved in refuting those charges, Ms. Uzelmeier made the professional and personal decision to restart her career outside of the sciences. PSMF ¶¶ 25-26. Specifically, she voluntarily withdrew from MSU in 1999 and never again entered any University degree or licensing program. *Id.* at ¶¶ 22, 27. She switched careers and commenced working in the financial services industry, where she is currently employed. She married Calvin Uzelmeier and is now the mother of one child. She has completely abandoned any career in the sciences and has no intent to ever become a federal contractor or apply for federal monies. In other words, she put the incident behind her and moved on with her life. *Id.* at ¶¶ 25, 28-34.

ORI did not move on. Instead, after sitting on her case for over seven years, it filed to debar her, alleging that debarment was necessary in order to "protect the Federal government" from the risk that Ms. Uzelmeier would file for (and somehow obtain) a federal grant in the next five years. Defs.' Ex. 3 at ORI Findings at 29. In recommending a five-year debarment, ORI also concluded that she lacked "present responsibility to be a steward to federal funds." Defs.' Ex. 3 at ORI Findings at 30. The finding on "present responsibility" was made without even the courtesy of one in-person interview. In addition to never even attempting to talk with Ms. Uzelmeier, ORI made no attempt to determine how (if at all) she could still pose a risk to the federal purse. It made no inquiry into other misconduct, criminal activities or ethical lapses that might indicate her "present responsibility."

On September 12, 2006, ORI served Ms. Uzelmeier the proposed debarment. Under HHS regulations, Ms. Uzelmeier was required to file a request for a hearing within 30 days of

service of the ORI letter.  42 C.F.R. § 93.501(a).  This time-deadline was jurisdictional in nature and could not be enlarged for any reason. § 93.503(c).  However, under the HHS rules, once a timely request for a hearing was filed and an administrative law judge assigned to the case, a party could request (within ten days) leave to file a supplemental request for a hearing. § 93.501(d).  This supplemental request is not subject to any jurisdictional time constraints.  *Id.*

In accordance with the guidance contained in the American Bar Association's *Practitioner's Guide to Suspension and Debarment* (relevant excerpts attached in the Addendum),[2] Ms. Uzelmeier promptly requested access to the complete "administrative record" relied upon by ORI to justify the debarment.  On September 29, 2006, one week before Uzelmeier's debarment was to go into effect, HHS responded and formally rejected her request for access to the record under both the Freedom of Information Act and Privacy Act: "The records at issue in your request are part of an open investigation.  As such, release of information at this time could reasonably be expected to interfere with ongoing proceedings.  Therefore, I must deny you access to the requested records."  Plaintiff's Exhibit ("Pl.'s Ex.") 4 (at HHS Sept. 29, 2006 Ltr.) at 1.

On October 11, 2006, Ms. Uzelmeier filed a timely request for a hearing.  (Attached as Defs.' Ex. 5.)   On October 30, 2006, Ms. Uzelmeier filed a timely motion to supplement her hearing request.  Pl.'s Ex. 3; PSMF ¶ 51.  Also on October 30, Ms. Uzelmeier filed a motion for dismissal based on the failure of HHS to demonstrate subject matter jurisdiction over her.  *Id.*

---

[2]    The Debarment and Suspension Committee of the Public Contract Law Section of the American Bar Association's *Practitioner's Guide to Suspension and Debarment*, Third Edition, 2002, p. 75.  Authors include both government and private sector lawyers: Richard J. Bednar of Crowell & Moring, LLP; John T. Boese of Fried, Frank, Harris, Shriver & Jacobson; Thomas B. Carr of Baker Botts L.L.P.; Craig S. King of Arent Fox Kintner Plotkin & Kahn, PLLC; James M. McHale of the U.S. Securities and Exchange Commission; Steven A. Shaw of the Department of the Air Force; and Donald J. Suda of the General Services Administration.

Specifically, Ms. Uzelmeier alleged that she did not constitute a "threat" as a potential contractor of federal funds as required under the law. *Id.* at 3. Additionally, she alleged that the delays in filing the claim rendered the allegations against her "stale." *Id.* at 3-4; PSMF ¶ 51.

On March 5, 2007, the HHS Departmental Appeals Board ("DAB") administrative judge assigned to this matter, Carolyn Cozad Hughes, dismissed Ms. Uzelmeier's request for a hearing. (DAB Order attached as Defs.' Ex. 2.) Judge Hughes never discussed or ruled on either the motion to supplement the hearing request or the motion to dismiss. Additionally, in her order, Judge Hughes stated that her jurisdiction over the claim was very limited. Defs.' Ex. 2 at, e.g., 3 ("these defenses . . . raise issues that I have no authority to address"). She never fully explained why she either did or did not have jurisdiction to rule over a variety of issues raised by Ms. Uzelmeier.

On March 12, 2007, over Ms. Uzelmeier's objections, the HHS Acting Deputy Assistant Secretary for Acquisition Management and Policy entered a five-year debarment against Ms. Uzelmeier. Defs.' Ex. 1 at 3. The debarment notification and other derogatory information about Ms. Uzelmeier were published by HHS on the World Wide Web at http://ori.dhhs.gov/misconduct/cases/Uzelmeier.shtml.

On April 24, 2007, Ms. Uzelmeier filed this action in order to appeal HHS' debarment decision and its decision to deny Ms. Uzelmeier access to documents under the Privacy Act.

On August 20, 2007, HHS filed its Motion to Dismiss, or in the Alternative, for Summary Judgment.

Ms. Uzelmeier also hereby files her opposition to Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment and files a Cross Motion for Partial Summary Judgment. Additionally, in accordance with Local Rules 7(h) and 56.1, Ms. Uzelmeier also hereby files a

separate Plaintiff's Opposition to Defendant's Statement of Material Facts and Plaintiff's

Statement of Material Facts Not in Genuine Dispute ("PSMF").  The facts set forth in the PSMF

are also incorporated herein by reference.

**ARGUMENT**

**PART ONE**

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY FOR SUMMARY JUDGMENT ON DEBARMENT ISSUES**

I.    **DEFENDANTS' MOTION MUST BE DENIED DUE TO HHS' VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AND BECAUSE OF THE EXISTENCE OF DISPUTED ISSUES OF MATERIAL FACT.**

   A.   **The ALJ's Failure to Rule on Respondent Uzelmeier's Motion to Dismiss And Motion for Leave to Supplement Her Hearing Request Was a Violation of APA §§ 555(e) and 706(2)(A) and Was An Abuse of Discretion.**

The decision of HHS to debar Rebecca Uzelmeier constituted an abuse of discretion.

Under controlling regulations, Ms. Uzelmeier had only 30 days to file a request for a hearing

upon receipt of ORI's notice of intent to debar her.  42 C.F.R. § 93.501(a).  This 30-day

requirement is jurisdictional in nature.  However, HHS permits respondents to seek permission to

file a supplemental request for a hearing in which a party can provide additional factual and legal

grounds justifying a contested hearing in a debarment proceeding.  § 93.501(d).  Ms. Uzelmeier

properly sought leave to file a supplemental hearing request.  (Attached as Pl.'s Ex. 3.)  HHS

abused its discretion when it simply failed to rule on this request, completely ignoring its own

regulations concerning supplemental hearing requests.

On September 12, 2006, Ms. Uzelmeier received notice from ORI of its findings of

research misconduct against her and of its intention to debar her.  Ms. Uzelmeier timely filed a

request for a hearing in which to contest ORI's findings and proposed debarment.  Subsequently,

under 45 C.F.R. 93.501(d), "[a]fter receiving notification of the appointment of the ALJ," Ms.

8

Uzelmeier had "10 days to submit a written request to the ALJ for supplementation of the hearing request."

On October 30, 2006, Ms. Uzelmeier, in full compliance with the HHS controlling regulation, filed to supplement her hearing request. *See* "Motion to Dismiss ORI's Proposed Debarment of Rebecca Uzelmeier or in the Alternative Motion for Leave to File Supplementation of the Hearing Request." (Attached as Pl.'s Ex. 3.)

Both parties briefed the motion.

Administrative Law Judge Carolyn Cozad Hughes, however, *never ruled on this motion*. She completely ignored HHS' regulations on supplementation of hearing requests. This was an egregious error, as the initial filing deadline for Ms. Uzelmeier's Request for Hearing was jurisdictional in nature, and could not be enlarged for any reason. In other words, the HHS rules clearly acknowledge that respondents may need more then 30 days to prepare an adequate response to a proposed debarment. In Ms. Uzelmeier's case, the proposed debarment was based on two reports (the MSU report and the ORI follow-up report) which took these large institutions (with relatively unlimited resources) seven years to construct. Thus, it should not have been surprising to HHS that Ms. Uzelmeier would request leave to supplement her Hearing Request.

HHS simply acted as if no such request had ever been filed, and completely ignored its own procedures. Instead, on March 5, 2007, the HHS administrative judge issued an order entitled "Dismissal of Respondent Uzelmeier's Hearing Request," without once mentioning that Ms. Uzelmeier had requested leave to supplement her hearing request. (Attached as Defs.' Ex. 2.).

The administrative law judge's failure to rule on the motion was an abuse of discretion. It is well established that agencies are required to follow their own regulations, and failure to do so constitutes error. *See e.g., Reuters Ltd. V. F.C.C.*, 781 F.2d 946, 947 (D.C. Cir. 1986).

In addition to failing to follow its own regulations, the actions of HHS violated the Administrative Procedure Act ("APA"). Administrative Procedure Act ("APA") §555 describes the procedures required for informal adjudication. Under APA §555(e), an agency must give "prompt notice" of the denial of "written application, petition, or other request of an interested person made in connection with any agency proceeding." 5 U.S.C. 555(e). Furthermore, such notice "shall be accompanied by a brief statement of the grounds for denial." *Id.*

In addition, the Supreme Court has found that APA §706(2)(A) "which directs a court to ensure that an agency action is not arbitrary and capricious or otherwise contrary to law, imposes a general 'procedural' requirement  by mandating that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision." *PBGC v. LTV Corp.*, 496 U.S. 633, 654 (1990).

Under APA § 555(e), Hughes was required to give Ms. Uzelmeier "prompt notice" of what was apparently a denial of Ms. Uzelmeier's hearing supplementation request, "accompanied by a brief statement of the grounds for denial." Under APA § 706(2)(A), she was required to provide an explanation that would "enable the court to evaluate the agency's rationale at the time of decision." *PBGC*, 496 U.S. at 654. She did neither.

Defendants' Motion to Dismiss, or in the Alternative for Summary Judgment of Ms. Uzelmeier's challenge to the debarment must be denied and Hughes' "decision" must, at the very least, be remanded for an adjudication of Uzelmeier's Request to Supplement.

**B. The ALJ's Denial of Uzelmeier's Request for a Hearing Was Arbitrary, Capricious, an Abuse of Discretion and Not in Accordance with Law.**

**1. The ALJ Misinterpreted her Role Under HHS Research Misconduct Regulations and HHS Debarment Regulations.**

HHS committed error by failing to adjudicate the various legal and jurisdictional issues raised by Ms. Uzelmeier.

The only manner in which a respondent can contest ORI research misconduct findings or HHS proposed administrative actions is at a hearing that must be requested within 30 days of the respondent's receipt of a charge letter from ORI. 42 C.F.R. § 93.501(a). The ALJ must grant a respondent's hearing request "if the ALJ determines there is a genuine dispute over facts material to the findings of research misconduct or proposed administrative actions, including any debarment or suspension action." 42 C.F.R. § 93.503(a). If the ALJ does not grant a hearing, the respondent has no opportunity to contest ORI's findings, and the proposed administrative action, in this case debarment, is automatically entered.

In her order dismissing Uzelmeier's hearing request, administrative law judge Carolyn Cozad Hughes stated that the "sole issue before me is whether Respondent Uzelmeier has raised a genuine dispute over facts or law *material to ORI's findings of research misconduct* that may properly be addressed in a hearing." Defs.' Ex. 2 (DAB Order) at 2 (emphasis added). According to the controlling regulations, however, whether there were disputed facts with respect to alleged research misconduct was *not* the sole issue before Hughes. Subpart E of HHS' research misconduct regulations reads: "This subpart provides a respondent an opportunity to contest ORI findings of research misconduct *and HHS administrative actions*, including debarment or suspension . . .." 42 C.F.R. § 93.503(a) (emphasis added). HHS' Debarring Regulations, cited by Hughes on page 7 of her decision, instruct respondents that: "You will

11

have an additional opportunity to challenge the facts if . . . [y]our presentation in opposition raises a genuine dispute over facts *material to the proposed debarmen*t." 45 C.F.R. § 76.830(b) (emphasis added).

Hughes concludes her decision by reiterating: "I must grant Respondent Uzelmeier's request for hearing if I find a genuine dispute over facts *material to the findings of research misconduct*." Defs.' Ex. 2 (DAB Order) at 9 (emphasis added).[3] This is again a misstatement of her duty under the governing regulations, which state that: "The ALJ *must* grant a respondent's hearing request if the ALJ determines there is a genuine dispute over facts material to the findings of research misconduct *or proposed administrative actions*, *including any debarment or suspension action*." 42 C.F.R. § 93.503(a) (emphases added). Indeed, if it were not the case that a respondent is entitled to a hearing when she raises a dispute of material fact with respect to the government's choice to impose debarment, there would be no forum at all in which she could protest the government's choice of debarment as a sanction.

C. **HHS' Refusal to Provide the Administrative Record Combined With Its Misuse of a Police Report Constituted Reversible Error.**

On September 6, 2006, ORI sent Rebecca Uzelmeier notice of proposed findings of research misconduct against her and informed her that HHS' Debarring Official had found that "this misconduct in science is a cause for debarment." Defs.' Ex. 3 at ORI Charge Ltr. at 2. The letter concludes: "If you do not request a hearing, the findings and administrative actions set out above will be adopted as final, effective 30 days from receipt of this letter." *Id.* at 3.

---

[3]    Judge Hughes repeats this misunderstanding on page 2 of her Order: "I am directed to grant a hearing request *only* if the respondent raises a genuine issue of facts material to the findings of research misconduct" (emphasis in original); and again on pages 6-7: "However, to get to that point, a respondent must first comply with 42 C.F.R. § 93.501(c) by filing a hearing request that raises a genuine dispute material to the findings of research misconduct."

In accordance with the American Bar Association *Practitioner's Guide to Suspension and Debarment* ("*ABA Guide*") guidance that "an important first step for the respondent is to discover the basis for the agency's action by requesting a copy of the evidence relied on by the suspending or debarring official (the 'administrative record')," attached in Pl.'s Addendum at 5, on September 14, 2006, Ms. Uzelmeier requested "all documents referenced in the charge" against her including, but not limited to a "copy of NIH Grant R01 ES02520" and a "copy of the July 15, 1999 [MSU] Police Department Incident Report." (Uzelmeier's Request for Record attached as Pl.'s Ex. 4.) Five days later, Ms. Uzelmeier again requested that HHS provide "the complete administrative record" relied upon in its debarment charge "as quickly as possible." *Id.*

On September 29, 2006, one week before Uzelmeier's debarment was to go into effect, HHS responded: "The records at issue in your request are part of an open investigation. As such, release of information at this time could reasonably be expected to interfere with ongoing proceedings. Therefore, I must deny you access to the requested records." Pl.'s Ex. 4 at HHS Sept. 29, 2006 Ltr. at 1.[4]

---

[4]     The letter continued: "My decision to withhold the information is based upon FOIA, 5 U.S.C. 552(b)(2) and (b)(7)(A), and the Department's implementing Public Information Regulations, see 45 C.F.R. 5.63 and 5.68(a)." Pl.'s Ex. 4 at HHS Sept. 29, 2006 Ltr. at 2. FOIA Exemption 2 applies to records "related solely to the internal personnel rules and practices of an agency;" Exemption 7(A) applies to "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings," which 45 C.F.R. § 5.68 further clarifies as meaning that: "We may withhold information whose release could reasonably be expected to interfere with prospective or ongoing law enforcement proceedings."

The record clearly did not relate "solely" to HHS' "internal personnel rules and practices," if it related to them at all. And while Uzelmeier vigorously disputes that debarment proceedings are "law enforcement proceedings," even if they are, ORI's proceedings as of September 29, 2006, one week before Uzelmeier's debarment was to go into effect, could not reasonably have been said to have been "prospective or ongoing." The administrative record had *already* been relied upon to find that Uzelmeier had engaged in research misconduct and that debarment was warranted. ORI's inquiry was therefore, for all intents and purposes, closed.

According to the *ABA Guide*, there are only "limited circumstances when the entire administrative record will not be disclosed, such as where disclosure might compromise an ongoing criminal investigation," and, as such, "agencies provide the full administrative record . . . in those cases where it is requested." Pl.'s Addendum (*ABA Guide*) at 75 and 75 n.284. Not only was there no "ongoing criminal investigation" in Uzelmeier's case, but by HHS' own admission its investigation had in essence come to a close. *See* Defs.' Ex. 3 at ORI Charge Ltr. at 2 ("the official in [HHS] who is authorized to impose debarment[] has reviewed these findings and finds that this misconduct in science is a cause for debarment under 45 C.F.R. § 76.800(d)"). It was therefore exceedingly unusual that HHS refused to release the administrative record.

HHS' unusual decision was highly prejudicial to Ms. Uzelmeier, as HHS well knew. As of September 29, 2006, the date on which HHS refused to release the administrative record, Ms. Uzelmeier had seven days remaining in which to demonstrate "disputed material facts" that would entitle her to a hearing in which to refute the charges against her. Defs.' Ex. 3 at ORI Charge Ltr. at 3. Uzelmeier's burden under HHS misconduct in science regulations was to "specifically deny each finding of research misconduct in the charge letter, each basis for the finding and each HHS administrative action." 42 C.F.R. § 93.503(b). Uzelmeier's "general denial or assertion of error for each finding of research misconduct and any basis for the finding, or for the proposed HHS administrative actions in the charge letter, is not sufficient to create a genuine dispute." 42 C.F.R. § 93.503(a). Without the record underlying the findings of ORI and

---

HHS' rationale on September 29, 2006 for not releasing the administrative record (that it "related solely to the internal personnel rules and practices of the agency" and that release "could reasonably be expected to interfere with prospective or ongoing law enforcement proceedings") is so farfetched as to raise the inference that the withholding was not done in good faith.

the Debarring Official, Ms. Uzelmeier was at a tremendous disadvantage in "specifically"

denying the "basis" of each of ORI's findings and the proposed 5-year debarment.[5]

For example, the MSU Police Department Incident Report specifically requested by Ms.

Uzelmeier on September 14, 2006 was heavily relied upon in ORI's Sept. 6, 2006 Findings and

was the basis of ORI's claim that Uzelmeier "admitted through her attorney" that her allegations

of theft were unfounded and that she had filed a false police report.[6]  ORI explained in a footnote

to the findings attached to its September 6, 2006 Charge Letter that it had not attached the police

---

[5]      On pages 15-16 of Defendants' Memorandum, they attempt to justify HHS' failure to
provide Ms. Uzelmeier with access to the documents relied upon by ORI in its debarment
decision (the "administrative record") by arguing: a) that Uzelmeier wasn't entitled to discovery
at the Hearing Request stage of the proceeding; and b) that Ms. Uzelmeier had various
documents in storage.  Both grounds are frivolous.  First, as indicated in the *ABA Guide*,
agencies will voluntarily turn over the complete administrative record after issuing a letter of
proposed debarment.  See Pl.'s Addendum at 5.  Contrary to best practices, ORI would not turn
over documents necessary to properly evaluate and refute the multiple allegations, even in
response to a Privacy Act request.  Consequently, Ms. Uzelmeier properly requested that the
administrative law judge direct HHS to turn over the documents.  This request, like the other
requests filed by Ms. Uzelmeier, was simply ignored by the administrative judge.  As to
Defendants' document storage issue, as previously noted, Ms. Uzelmeier had moved on with her
life and had placed whatever documents she may have possessed concerning this incident in
storage, however, Ms. Uzelmeier at no point had the complete record relied upon by ORI; she
had only the documents that MSU had provided in its discretion.

[6]      Examples of ORI's references to the MSU police report include: "Respondent even filed
a police report," Defs.' Ex. 3 at ORI Findings at 2; "Respondent reported to the MSU police
department that critical research information had been removed from her office with her
authorization," *id*. at 5; "After Respondent's initial report, she never replied to the police
department's request for additional questioning," *id;* "About fifteen days after Respondent
reported the alleged theft of her data, Officer Zezulka of the MSU Police Department received a
call from Respondent's then attorney Jeffrey Green, who stated that respondent 'indicated that
the larceny report was unfounded,'" *id;* "Respondent admitted through her attorney that her theft
allegation was false," *id*. at 6;  "Respondent later admitted through her attorney that the larceny
report was unfounded.  Notwithstanding her admission that the police report was unfounded, her
August 18, 2000 letter to MSU's inquiry committee repeated her false allegation regarding
larceny of data," *id*. at 29;  and finally, "A five-year debarment is appropriate in this case
because of the aggravating factors, especially Respondent's obstruction of a federally-mandated
investigation through multiple unfounded allegations of tampering and an admittedly baseless
larceny report to the MSU's police department," *id*. at 31

report "in order to protect Respondent's personal identification information." Defs.' Ex 3 at ORI

Findings at 5 n.3. That explanation is false on its face. The MSU report charged Ms. Uzelmeier

with, among other things, "obstruction of a federally-mandated investigation through multiple

unfounded allegations of tampering and an admittedly baseless larceny report to MSU's police

department." Defs.' Ex. 3 at ORI Findings at 31. It seems unlikely that an agency that boldly

charged Ms. Uzelmeier with a federal crime would be concerned for the protection of her

"personal identification information;" information that in any event could have been easily

protected through redaction. That HHS *again* refused to release the Police Report on September

29, 2006 because it was part of an "open investigation" does not pass the smell test.

Only when Defendants attached the Police Report as an exhibit to their pending Motion

to Dismiss was Uzelmeier finally able to view it, and only then did it become clear why HHS

had refused to release it. The document is implausible on its face. The Police Report claims that

Uzelmeier's attorney, Jeff Green, contacted Officer Zezulka by telephone and:

> advised that he was representing COMPLAINANT REBECCA MARCUS. Mr.
> GREEN advised that REBECCA indicated the larceny report is unfounded. This
> OFFICER [Zezulka] inquired as to whether REBECCA has misplaced the
> missing/stolen property or whether the items had never been taken. Mr. GREEN
> stated, "I can't really answer your questions. . . . This OFFICER informed Mr.
> Green of the follow up investigation and there was information regarding a false
> police report."

Defs.' Ex. 8 (MSU Police Supplemental Report) at 8.

Not only did Ms. Uzelmeier's attorney Jeff Green never contact the MSU police and

assert that Ms. Uzelmeier's larceny report was unfounded, (see affidavit of Jeff Green, attached

16

as Pl.'s Ex. 2), but, because no lawyer would *ever* do such a thing, the report should have been immediately suspect to ORI and suggestive of the bias permeating the MSU investigation.[7]

The agency failed to articulate any legitimate reason for ignoring the guidance contained in the *ABA Practitioner's Guide* concerning the production of the complete administrative record. As the *Guide* points out, production of the administrative record is standard operating procedure in debarment proceedings; there is nothing so unique about the Uzelmeier case to justify a departure from this established rule. Moreover, given Ms. Uzelmeier's need to retain expert testimony and expend considerable resources rebutting ORI's scientific claims, it would be highly prejudicial to require her to establish the factual predicate for a hearing twice, first on the basis of ORI's potentially self-serving articulation of the facts in its report, and a second time reevaluating those facts in light of the complete record. The *Practitioner's Guide* recognized a reasonably efficient method of adjudicating cases such as the Uzelmeier debarment; there was

---

[7]     Another example of prejudice resulting from HHS' refusal to release the administrative record stems from its claim that "because of [Ms. Uzelmeier's] conduct, MSU was required to withdraw [a grant] application, thereby foreclosing the possibility to receive Federal funding." Defs.' Ex. 3 at ORI Findings at 27. HHS never produced the grant application that MSU was supposedly forced to withdraw, nor did it ever provide a citation to it. ORI's Findings simply state that: "As a direct Result of Respondent's actions, MSU was required to withdraw its NIH grant application." *Id.* at 30. ORI's Charge Letter states that Ms. Uzelmeier "intentionally and knowingly fabricated and falsified data…with research supported by National Institutes of Health (NIH) grant R01 ES02520." Defs.' Ex. 3 at ORI Charge Ltr. at 1. This is the only information Ms. Uzelmeier ever received regarding any grant relied upon by or referenced in ORI's investigation. Neither ORI's charge letter, nor its Findings, nor ORI's March 12, 2007 nor March 27, 2007 debarment letters provide a citation to the grant application that MSU allegedly had to withdraw. MSU's unsubstantiated allegation that Ms. Uzelmeier had "foreclose[d] the possibility" of MSU's receiving federal funding was considered by ORI as an aggravating factor in its decision to debar Ms. Uzelmeier for five years. Ms. Uzelmeier finds it difficult to believe that she "forclos[ed] the possibility" of MSU receiving federal funding, as MSU continued to receive Federal Funding for the very grant that Ms. Uzelmeier did her research under until 2005. Had HHS allowed Ms. Uzelmeier access to her administrative record, she would have been able to respond specifically to this allegation. (*See* http://www.researchcrossroads.com/index.php?option=com_dbquery&Itemid=60&task=Execute Query&qid=18&grant_id=2132378, and received other grants for research projects for Professor Kaminski and others http://msu.edu/unit/vprgs/RNspring2003/resawardsj-r.htm.)

simply no justification whatsoever for trying to force her to rebut hundreds of separate factual allegations without access to the complete administrative record.

## II.    THE ALJ IGNORED ISSUES OF DISPUTED MATERIAL FACT THAT JUSTIFIED A HEARING UNDER THE GOVERNING REGULATIONS.

Ms. Uzelmeier was debarred because the Debarring Official found her alleged misconduct in science "a cause for debarment under 45 C.F.R. § 76.800(d)."  Defs.' Ex. 3 at ORI Charge Ltr. at 2.  45 C.F.R. § 76.800(d) in turn states that HHS may debar a person for "Any other cause of so serious or compelling a nature that it affects your *present responsibility*" (emphasis added).

HHS' debarment regulations instruct that debarment "is a serious action that a Federal agency may take *only* to protect the public interest.  A Federal agency *may not* exclude a person . . . for the purposes of punishment."  45 C.F.R. § 76.110(c) (emphases added).  *See also Canales v. Paulson*, 2007 WL 2071709, *1 (D.D.C. 2007) ("In all cases, however, debarment may be imposed only in the public interest for the Government's protection and not for purposes of punishment") (internal quotations removed).

Consequently, evidence proffered by Uzelmeier bearing on her 'present responsibility' or her absence of threat to the 'public interest' created "a genuine dispute over facts material to the findings of research misconduct or proposed administrative actions," and required that the ALJ grant her a hearing under  42 C.F.R. § 93.503(a).

In her hearing request, Ms. Uzelmeier argued that because of the life changes she had undergone in the seven years that passed between her alleged misconduct and ORI's proposed debarment, her alleged misconduct could not possibly affect her 'present responsibility,' and she could in no way be considered a 'threat' to the "public interest."  Defs.' Ex. 5a at e.g. 3-6. Shortly after filing her request for a hearing, Ms. Uzelmeier filed a detailed motion to dismiss

based on these arguments. (Attached as Pl.'s Ex. 3.) Specifically, she argued that HHS' attempt to debar her constituted impermissible punishment because she was no longer any form of threat to the federal purse, and that the debarment proceeding was "stale" or moot as a matter of law due to the amount of time that had transpired between the original allegations against a graduate student and HHS' tardy response.[8] *See generally* Pl.'s Ex. 3.

The agency committed error when it simply failed to address the critical jurisdictional issues raised by Ms. Uzelmeier both in her Hearing Request and in her Motion to Dismiss. Presumably, someone in the agency had an obligation to ensure that HHS met its burden of proof by ensuring that the debarment of Ms. Uzelmeier complied with the "present responsibility" and "public interest" requirements, and that the relationship between protecting the public purse and debarring Ms. Uzelmeier was not so remote as to render the claim stale. It was arbitrary, capricious, an abuse of discretion and not in accordance with law for the agency to simply ignore legal arguments while adjudicating debarment. Agencies cannot adjudicate in an ostrich-like fashion and figuratively speaking stick their head in the sand when confronted with tough jurisdictional arguments. This Court should review Plaintiff's Exhibit 3, her Motion to Dismiss the Proposed Debarment, alongside the administrative law judge's decision (Defs.' Ex. 2); it will be apparent that the substantive jurisdictional issues were ignored by the agency in toto. At a

---

[8]      The administrative law judge clearly misinterpreted her duty under the governing regulations. She apparently concluded that she had no jurisdiction to rule on any of the substantive legal challenges and that her jurisdiction was limited solely to identifying scientific factual disputes concerning the research misconduct issues. For example, on page four of her March 5, 2007 Order, Hughes stated that she had "no authority to dismiss ORI's action based on timeliness," and on page five she wrote that "this argument cannot prevail in this administrative forum since, as discussed above, the regulations that govern these proceedings specifically allow ORI to initiate this action even after seven years." Defs.' Ex. 2. That the ORI is not governed by a specific statute of limitations is beside the point—Ms. Uzelmeier's facts were intended to (and did) create a genuine dispute over facts material to her "present responsibility" – the very core of HHS' proposed debarment.

minimum, Defendants' Motion to Dismiss or for Summary Judgment must be denied and HHS'

debarment decision vacated and remanded for consideration of the jurisdictional issues.  *See,*

*e.g., Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C.Cir.2001) ("If an appellant . . .

prevails on its APA claim, it is entitled to relief under that statute, which normally will be a

vacatur of the agency's order."); *Humane Society of the U.S. v. Johanns*, 2007 WL 1120404

(D.D.C.); *Greater Yellowstone Coal. v. Bosworth*, 209 F.Supp.2d 156, 163 (D.D.C.2002).

### III.    HHS' RELIANCE ON THE CASE OF *BURKE V. EPA* IS MISPLACED. *BURKE* ACTUALLY PROVIDES CLEAR AUTHORITY TO VACATE THE DEBARMENT.

Defendants place great emphasis on the case of *Burke v. U.S. E.P.A.*, 127 F.Supp.2d 235

(D.D.C. 2001) to justify the debarment decisions reached in this matter.  Defs.' Mem. P. &

A. at 9-10, 18, 20.  As explained below, this reliance is not only misplaced, but in fact *Burke*

provides authority for vacating the debarment and granting Ms. Uzelmeier's Cross Motion to

for Summary Judgment.

The facts in *Burke* do not compare at all with the facts in this case.  First, Mr. Burke was

the "president and sole shareholder" of the company accused of criminally violating its EPA

permit.  *Burke*, 127 F.Supp at 236.  Ms. Uzelmeier was not the president or sole shareholder

of anything – she was simply a graduate student.

Next, Burke "plead guilty" to criminally violating the law, and "was sentenced to eight

months in prison, four months at a halfway house, and one year supervised release."  *Id.* at

237.  Additionally, Burke's company "pled guilty of conspiring to defraud the United States"

and was fined $1.8 million dollars.  *Id.*  Ms. Uzelmeier was never even charged with any

criminal wrongdoing – let alone found guilty of a criminal act.  This is not surprising,

because in the United States academic misconduct committed by a student is not generally

considered grounds for an indictment.  Moreover, Ms. Uzelmeier was never required to pay any fines and was never required to serve time in prison.

The *Burke* decision is not only factually distinct from the case at bar, but its sets forth the controlling legal standard on "present responsibility," which fully supports Ms. Uzelmeier's Motion for Summary Judgment.

As the *Burke* court explained, "past misconduct" standing alone cannot, as a matter of law, justify a debarment.  The existence of past misconduct is a necessary predicate for a debarment, but "the final decision to debar an individual must focus on that individual's *present business responsibility.*"  *Burke*, 127 F. Supp.2d at 239 (emphasis added).  Critical to evaluating whether sufficient "present business responsibly" exists is an evaluation as to whether "the business risk to the government has been eliminated to the extent that debarment would be unnecessary."  *Id.*

This is the critical analysis in which HHS (and the administrative judge) never engaged. The central ground raised by Ms. Uzelmeier in her Hearing Request (which was also raised in her October 30, 2006 Motion to Dismiss, Pl.'s Ex. 3) was that any conceivable "risk" to the government had, in fact, been completely "eliminated" by the events which had transpired in the seven years since ORI received notification of the academic/research misconduct allegations.

As fully set forth in Part Two of this Brief, infra, there are simply no facts which could sustain an agency finding that Ms. Uzelmeier constitutes a current "business risk to the government."  Unlike most of the persons who challenge debarment, Ms. Uzelmeier is not challenging HHS' decision in order to once again engage in business with the government. She never was a government contractor or grant recipient and has no intention whatsoever to

ever become such a contractor or recipient. She was a graduate student accused of misconduct. As a result of those allegations, she moved on with her life. She left the sciences, never pursued an advanced degree, never pursued a professional license or other credential that would qualify her to be a grant recipient of an HHS (or other government) grant. She married, had a child, radically altered her career path and became a financial analyst working in the private sector.

HHS never pled any facts that would justify a finding that Ms. Uzelmeier constitutes a current business risk for the government. Indeed, when Ms. Uzelmeier fully briefed this issue in her Motion to Dismiss filed with the administrative judge, the judge simply ignored the motion altogether, and acted as if the issue did not even exist. (Attached as Pl.'s Ex. 3.) Judge Hughes never ruled on the motion and never made any findings related to demonstrating the second prong necessary to justify debarment -- that Ms. Uzelmeier reasonably constitutes a current (or future) "business risk to the government." Assuming that in her capacity as a graduate student she could in the future have obtained a Ph.D. and/or other advanced scientific qualifications that could potentially have afforded her an opportunity of being awarded HHS contracts or grants, that potential risk was "eliminated" when Ms. Uzelmeier moved on with her life, leaving the bad memories and experiences of her voluntarily terminated career as a graduate student behind her.

Before this Court HHS argues that because Ms. Uzelmeier could "re-enter" the "scientific field" that somehow this constitutes a sufficient "business risk to the government" to justify a five year debarment. Defs.' Mem. P. &A. at 18. However, HHS relies *solely* on speculation to reach this conclusion. Under this theory, any person in the United States could constitute a

"business risk to the government" regardless of how remote. HHS simply ignores the facts of the current case.

First, HHS ignores the fact that Ms. Uzelmeier does not own a business and has no advanced degree or certification that renders her a threat to the public purse.

Second, HHS ignores the fact that Ms. Uzelmeier's academic record at MSU is such that any risk that she would reenter a university and attempt once against to get an advanced science degree is, to say the best, radically remote.

Third, HHS ignores *all* of the facts that demonstrated that Ms. Uzelmeier put this incident behind her and abandoned any aspirations for a career in the sciences and/or a career as a government contractor. They never even attempted to contest any of the facts related to Ms. Uzelmeier's change in life circumstances and how those changes impacted the business threat prong of the debarment analysis.

It is an elementary tenant of administrative law that agency decision making cannot be based on speculation. *Horsehead Resources Development Co., Inc. v. Browner*, 16 F.3d 1246, 1269 (D.C. Cir. 1994). Defendants' sole justification for finding Ms. Uzelmeier a present-day threat to the federal purse was a hypothetical based on pure speculation, with no citation to any actual fact. Defendants didn't even have the courtesy of asking Ms. Uzelmeier one question to elicit any non-speculative support for this critical finding.

## IV.    HHS' RELIANCE ON A FACTUALLY INACCURATE POLICE REPORT, STANDING ALONE, NECESSITATES DENIAL OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.

ORI's September 2006 charge letter recommending the five-year debarment of Rebecca Uzelmeier was based in part on new allegations, of which Ms. Uzelmeier had previously been unaware. Specifically, ORI alleged that Uzelmeier's own attorney called the MSU police

23

department and informed them that his client had filed a false police report.  *See* Defs.' Ex. 3 at

ORI Findings at 5.  This allegation was prominent in the proceedings before HHS and, in fact,

repeated before this Court in Defendants' Motion to Dismiss or for Summary Judgment.  *See*

Defs.' Mem. P. & A. at 19.  Defendants appear to have been so taken with this argument that

they even attached the Police Report to their pending motion (even though the report was never

placed on the administrative record before the agency, and even though HHS adamantly refused

to provided Ms. Uzelmeier with a copy of the report when during the course of the

administrative proceedings). *See* Defs.' Ex. 8.

    The true facts concerning this police report are very troubling and demonstrate what appears

to be bias within the agency.  As stated above, the agency refused to release a copy of the report

during the debarment proceedings.  Ms. Uzelmeier never saw the report until it was submitted as

an exhibit to the currently pending Motion to Dismiss or for Summary Judgment.

    Upon receipt of the police report, Ms. Uzelmeier forwarded it to the attorney who HHS

alleged made the incriminating concession.  As it turns out, Ms. Uzelmeier's attorney never

made such a statement.  The attorney, Jeffrey Green, has executed an under-oath affidavit

explicitly denying the statement.[9]  See Pl.'s Ex. 2 (Jeff Green Aff.) ¶¶ 6-7 ("I never advised

[anyone] that Rebecca Marcus had asserted that the larceny report was unfounded.  The

conversation I had with the Michigan State University Department of Police was for the purpose

of withdrawing Rebecca Marcus' criminal complaint in order to pursue it elsewhere; it had

nothing to do with any lack of foundation for the report.")  Due to HHS' reliance on a factually

inaccurate police report, the record contains disputed issues of fact material to the debarment,

and Defendants' Motion to Dismiss or for Summary Judgment must be denied.  Moreover,

---

[9]    HHS, on the other hand, was never able to provide an under-oath declaration attesting
that any such statement was made.

should this Court find that the MSU police report was factually inaccurate, the debarment must at the very least be remanded to the agency for reconsideration of the debarment decision and/or its length.

### PART TWO

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER CROSS MOTION FOR SUMMARY JUDGMENT ON DEBARRMENT ISSUES.

I.    **HHS EXCEEDED ITS AUTHORITY UNDER FEDERAL LAW AND REGULATION WHEN IT DEBARRED UZELMEIER WITH NO FINDING THAT SHE LACKED PRESENT RESPONSIBILITY OR THAT DEBARMENT, RATHER THAN A LESSER SANCTION, WAS NECESSARY TO PROTECT THE PUBLIC INTEREST.**

HHS deviated from the procedure mandated under its regulatory scheme and consequently exceeded its authority under law when it based its debarment of Rebecca Uzelmeier exclusively on ORI's finding that she had committed misconduct in science in 1999 without demonstrating how this alleged misconduct made Ms. Uzelmeier's debarment, seven years later, "in the public interest," nor how Uzelmeier's alleged misconduct seven years earlier affected her "present responsibility."[10]

### A. Legal and Regulatory Prerequisites for Debarment.

In 1986, President Reagan signed Executive Order 12549, "Debarment and Suspension," authorizing the Office of Management and Budget ("OMB") to "prescribe government-wide criteria and government-wide *minimum due process procedures*" for debarment and suspension. (Executive Order 12549, 1986, Section 6, emphasis added). The following year, OMB issued its "Guidelines for Nonprocurement Debarment and Suspension." In May of 1988, 27 Federal agencies, including HHS, adopted these debarment regulations; HHS codified them at 45 C.F.R.

---

[10]    *See* Defs.' Ex. 1 at HHS March 12, 2007 Ltr. at 1 ("the basis for this debarment are [sic] the findings made by the Office of Research Integrity that you are responsible for committing misconduct in science in research that was supported by the Public Health Service.")

Part 76.  In 1992, Congress established the Office of Research Integrity ("ORI") as an

independent entity within HHS, mandating the "prompt" conduct of investigations and "taking of

other actions" with respect to research misconduct.  42 U.S.C. § 289b(c).

It was under the government-wide nonprocurement debarment regulations that ORI

debarred Ms. Uzelmeier.[11]  Specifically, HHS' Debarring Official found Ms. Uzelmeier's

alleged misconduct in science was "a cause for debarment under 45 C.F.R. § 76.800(d)," Defs.'

Ex. 3 at ORI Charge Ltr. at 2, that is, a "cause of so serious or compelling a nature that it affects

your present responsibility," 45 C.F.R. § 76.800(d).[12]

The government-wide debarment regulations stress that debarment is a "serious action

that a Federal agency may take *only* to protect the public interest. . . . [and] not . . . for the

purposes of punishment."  45 C.F.R. § 76.111(c) (emphasis added).  The government has the

"burden to prove that a cause for debarment exists," 45 C.F.R. 76.855(a), and must "establish the

cause for debarment by a preponderance of the evidence," 45 C.F.R. § 76.850(a).

    **B.** **Because the Government-Wide Debarment Regulations Under Which**
          **Uzelmeier Was Debarred Were Not Written By HHS and Interpreted Only**
          **By the Debarring Official, No Deference is Due.**

While it is axiomatic that an agency's interpretation of its own regulations is entitled to

considerable deference, the DC Circuit has in certain circumstances found such deference

inappropriate.  In overturning a debarment action by the Department of Defense ("DOD"), the

---

[11]    "This [proposed debarment] action is being taken pursuant to the Government-wide
nonprocurement debarment rule, codified by the Department of Health and Human Services at
45 C.F.R. Part 76."  Defs.' Ex. 3 at ORI Charge Ltr. at 2.

[12]    The term "present responsibility" is not defined in the regulations.  In the 1987 Federal
Register in which OMB issued the regulations, it reported that a "number of commenters
suggested we define more terms, such as . . . "present responsibility" . . .. The task force
concluded that the use of each in its context makes any further definition unnecessary."  52 FR
20360, 20362 (May 29, 1987).

Court asserted that "deference was inappropriate," and that it would "construe the regulations at issue with minimal deference . . . ." *Caiola v. Carrol*, 851 F.2d 395, 399 (DC Cir. 1988).

First, the court found that because the regulation at issue "was written and promulgated not only by DOD, but by GSA and NASA as well," the "diffusion of the interpretive authority among several agencies, and the possibility of inconsistent interpretations, weaken the case for deference." *Id.  See also Administrative Law Treatise*, Richard J. Pierce Jr. § 6.11 (courts do not defer to one agency's interpretation of another agency's rule).  Secondly, "the only agency official to construe [the debarment regulation at issue] was . . . [the agency's] debarring official, *not* the head of the agency.  While [the debarring official's] interpretation is, of course, entitled to a 'modicum of respect' in this court, we need not accord it dispositive weight." *Caiola*, 851 F.2d at 399.

In this case, the regulatory provision under which Ms. Uzelmeier was debarred, 45 C.F.R. § 76.800(d), and the general regulatory scheme contained in 45 C.F.R. Part 76, were written, not by HHS, but by OMB, and were promulgated jointly, not by three, but by *twenty-seven* agencies.  Moreover, as in *Caiola*, the only agency official to construe the debarring regulation at issue was HHS' debarring official, not the head of the agency.[13]  Consequently, as in *Caiola*, this Court should "construe the regulations at issue with minimal deference." 851 F.2d at 399.

---

[13]    By her own admission, the ALJ limited herself exclusively to the question of whether Uzelmeier had raised a genuine issue of fact material to ORI's findings of *research misconduct* under HHS' research misconduct regulations at 42 Part 93, and considered it outside her jurisdiction to examine the Debarring Official's conclusion that Uzelmeier's alleged misconduct warranted debarment under 45 C.F.R. § 76.800(d).  *See* Defs.' Ex. 2 at *e.g.* 2 ("The sole issue before me is whether Respondent Uzelmeier has raised a genuine issue over facts or law material to ORI's findings of research misconduct").

C.  **Research Misconduct is Not a _Per Se_ Cause for Debarment.**

HHS is obligated, under the government-wide debarment regulations, to prove "by a preponderance of the evidence" that Uzelmeier's alleged research misconduct is "of so serious or compelling a nature that it affects [her] present responsibility" and that she was debarred "only to protect the public interest" and not "for the purposes of punishment." 45 C.F.R. §§ 76.850(a), 76.800(d), 76.110(c).  This it did not do.[14]  In fact, despite a list of 11 "HHS administrative actions" that "HHS may impose" in "response to a research misconduct proceeding," 42 C.F.R. § 93.407, HHS' sole justification for _debarring_ Uzelmeier, rather than imposing a lesser sanction, was that Uzelmeier's "several acts of misconduct in science establishes her lack of present responsibility to be a steward of federal funds."[15]  _See_ Defs.' Ex. 3 at ORI Findings at 30.[16] Merely asserting that committing research misconduct establishes lack of present responsibility does not make it so; particularly when Uzelmeier's alleged misconduct took place seven _years_ before HHS' finding, such circular reasoning does nothing to establish her lack of _present_ responsibility.

HHS clearly has the authority to impose debarment, and clearly has the authority to do so in response to a finding of research misconduct.  But as the Court pointed out in _Burke_, the

---

[14]    Significantly, HHS has "the burden to prove that a cause for debarment exists."  45 C.F.R. § 76.855(a).

[15]    HHS considered factors other than Uzelmeier's alleged research misconduct in its decision to extend the length of her debarment to five years, _see infra_, but it did not consider these other factors in its decision to debar her in the first instance.

[16]    HHS' own regulations clearly recognize that a finding of scientific misconduct standing alone cannot justify debarment.  As set forth in 42 C.F.R. § 93.408, "The purpose of HHS administrative actions is remedial.  The appropriate administrative action is commensurate with the seriousness of the misconduct, _and_ the need to protect the health and safety of the public, promote the integrity of the PHS supported research and research process, and conserve public funds." (Emphasis added.)

existence of "past misconduct" is simply the necessary predicate for a debarment.  A debarment decision "must focus" on an "individual's present business responsibility" and furthermore must show that the "business risk to the government has" not been "eliminated to the extent that debarment would be unnecessary."  *Burke*, 127 F.Supp.2d at 239.

As previously addressed, HHS has never articulated *any* facts to suggest that Rebecca Uzelmeier's debarment was instituted to protect the public interest rather than as punishment, let alone sufficient facts to prove its burden by a preponderance of the evidence, as required by 45 C.F.R. § 76.850(a).  It therefore exceeded its authority when it debarred Ms. Uzelmeier, and the debarment order must be reversed.  *See* 2 Am Jur 2d § 54 ("An agency has no power to act . . . outside of its own regulations. . . . [A]dministrative actions exceeding authority delegated by law are void.").

Not only did the agency fail to articulate facts that demonstrate how debarring a non-degreed former graduate student seven and-a-half years after the allegations in question arose somehow met its burden of proof, the agency simply ignored the undisputed facts placed on the record in a timely manner on two separate occasions by Ms. Uzelmeier.  These facts demonstrated without any doubt that HHS could not meet its burden to prove "by a preponderance of the evidence" that Uzelmeier's alleged research misconduct was "of so serious or compelling a nature" that it affected her "present responsibility" and that she was debarred "only to protect the public interest" and not "for the purposes of punishment."  45 C.F.R. §§ 76.850(a), 76.800(d), 76.110(c).

Here are the facts presented to the agency in both Ms. Uzelmeier's timely filed request for a hearing and her timely filed motion to dismiss ORI's proposed debarment, all of which were entirely ignored by the administrative judge: 1) Ms. Uzelmeier left MSU without a degree,

consequently possessing no advanced degree and no scientific licenses; 2) Ms. Uzelmeier was therefore not a threat to become a government contractor nor recipient of government funds; 3) Ms. Uzelmeier moved on with her life in the seven and-a-half years that had transpired since the incidents at MSU, including changing her career, marrying, and having a child; 4) In addition to not having any professional qualifications to be awarded grants or other government monies, Ms. Uzelmeier, without contradiction, asserted she had never been an applicant for federal funds and would not become such an applicant in the future; and 5) Ms. Uzelmeier completely abandoned pursuit of a career in the sciences, for which she had unsuccessfully attempted to obtain an advanced degree, radically changing her career and becoming a financial consultant. The agency never explained how a former graduate student who had abandoned any professional aspirations in any of the areas within HHS' jurisdiction somehow posed a contemporary threat to the public purse, nor did it produce a shred of evidence to show that in her current position, in which she has been working for years, she could have possibly qualified as a government contractor or grant recipient.

This Court need not remand on the issue of present responsibility. The facts are undisputed facts and the controlling law is clear. First, HHS had the burden of "focus[ing]" its decision to debar Ms. Uzelmeier on facts reacted to demonstrating her lack of "present business responsibility." *Burke*, 127 F.Supp.2d at 239. HHS simply failed to meet this burden. Moreover, even if the burden was on Ms. Uzelmeier to demonstrate that she was not a business risk to the government as part of the mitigating factor analysis, she clearly met this burden. She pled numerous facts which demonstrated – without contradiction – that whatever circumstances may have justified HHS action back in 1999 were "eliminated" by the time HHS decided to initiate the debarment process. *Burke*, 127 F.Supp.2d at 239. Given her radical change in

lifestyle, professional goals, educational plans, and career, Ms. Uzelmeier does not represent a current or future threat to HHS or government monies.

Under the regulations, HHS had to do more than simply show that Rebecca Uzelmeier engaged in research misconduct.  It had to show a nexus between Rebecca Uzelmeier and a coherent threat to the federal purse that would render debarment a non-punitive act to protect the public interest rather than an act of punishment.

II.    **THE MITIGATING FACTORS IGNORED BY HHS MANDATE THAT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE DENIED AND THAT PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT BE GRANTED.**

In 2005, HHS promulgated its "Public Health Service Policies on Research Misconduct" at 42 C.F.R. Part 93, which expressly "do[] not supersede or establish an alternative to any existing regulations or procedures for handling . . . actions taken under the HHS debarment and suspension regulations at 45 C.F.R. part 76."  42 C.F.R. § 93.408 states: "The purpose of HHS administrative actions is remedial.  The appropriate administrative action is commensurate with the seriousness of the misconduct, *and* the need to protect the health and safety of the public, promote the integrity of the PHS supported research and research process, and conserve public funds.  HHS considers aggravating *and mitigating* factors in determining appropriate HHS administrative actions and their terms."  (Emphases added.)

Assuming arguendo that HHS' regulations were not part of a government-wide scheme in which the agency's regulatory interpretation was entitled to little or no deference, the presumption of agency expertise may nonetheless be rebutted if its decisions are not reasoned.  *See ALLTEL Corp. v. F.C.C.,* 838 F.2d 551, 562 (D.C.Cir.1988).  "Where an agency fails to articulate 'a rationale connection between the facts found and the choice made,' *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council,* 462 U.S. 87, 88 (1983), the Court 'may not supply

a reasoned basis for the agency's action that the agency itself has not given.' *Dithiocarbamate Task Force v. E.P.A.,* 98 F.3d 1394, 1404 (D.C.Cir.1996) . . .. Furthermore, a court may consider only the rationale an agency gives for its actions at the time they occur and not 'post hoc rationalizations by . . . government agency counsel.' *Ace Motor Freight, Inc. v. I.C.C.*, 557 F.2d 859, 864 (D.C.Cir.1977)." *Canales*, 2007 WL at *4.

This Court has also suggested that review of agency action leading to debarment warrants special care: "While serving on our Court of Appeals . . . former Chief Justice Warren Burger explained that debarment 'directs the power and prestige of government at a particular person . . ..' *Gonzalez v. Freeman*, 334 F.2d 570, 578 (D.C.Cir.1964). Consequently, whereas the majority of administrative review actions concern agency rules that often impact citizens only indirectly, the resolution of debarment cases 'is a serious matter' that has an immediate and profound effect on the particular individuals involved. *Commercial Drapery Contractors Inc. v. United States,* F.3d 1, 6 (D.C.Cir.1998)." *Canales*, 2007 WL at *5.

HHS did consider "aggravating" factors in extending the length of Uzelmeier's debarment from the customary three years to five years.[17] *See* 45 C.F.R. § 76.865(a) ("Generally, debarment should not exceed three years. However, if circumstances warrant, the debarring official may impose a longer period of debarment."). The agency completely failed,

---

[17]    In its letter proposing findings of research misconduct and administrative action against Uzelmeier, HHS wrote: "A five-year debarment is appropriate in this case because of aggravating factors, especially Respondent's obstruction of a federally-mandated investigation through multiple unfounded allegations of tampering and an admittedly baseless larceny report to MSU's police department." Defs.' Ex. 3 at ORI Findings at 31. Uzelmeier strenuously objects to this characterization. Her allegations of tampering were found to be "unfounded" because they were never investigated nor taken seriously, and the "admittedly baseless larceny report" to which ORI refers was emphatically *not* unfounded. As has been discussed, ORI's characterization of Uzelmeier's withdrawal of the police report as an admission that it was baseless is not only absolutely without merit, but a clear indication of bias.

however, to consider, or even acknowledge, the mitigating factors cited by Uzelmeier.[18] Because it failed to abide by its regulations, the Court should vacate Uzelmeier's debarment. *See Reuters Ltd.*, 781 F.2d at 947 ("A precept which lies at the foundation of the modern administrative state is that agencies must abide by their rules and regulations.").

In *Canales v. Paulson*, the D.C. District Court set aside a debarment because the debarring official did not explain his consideration of mitigating factors and failed to articulate a rational basis for the debarment. Canales had presented several mitigating factors, including her spotless record before the criminal offense for which she was debarred and the fact that five years had passed without incident since that offense. "The [debarring official] acknowledged that the mitigating factors existed, but imposed . . . debarment without explaining why he found them unpersuasive." *Canales*, 2007 WL at *6. Because the debarring official "did not in any way explain his decision to impose debarment rather than a lesser sanction, given the strength of the mitigating factors, the Court cannot conclude that that decision was rational or that [the debarring official] satisfied the procedures outlined in FAR [Federal Acquisition Regulation] § 9.406.1(a)."[19] *Id.* The court granted Plaintiff's cross motion for summary judgment. *Accord*

---

[18]     See, for example, Uzelmeier's Hearing Request at page 2: Uzelmeier "does not have the professional credentials to qualify as a principal investigator or a grant recipient;" she has "abandoned the sciences as a profession, and currently works in a completely unrelated area;" she has "never applied for a government grant or contract; and at page 4: "given the amount of time that has passed since the initial allegations, and the fact that Mrs. Uzelmeier radically altered her career path, she is no longer a "threat" to become a federal contractor and the allegations against her are stale."  (Attached as Defs.' Ex. 4 (Hearing Request).)

[19]     The procedures outlined in FAR § 9.406.1(a), the government-wide procurement regulations governing the *Canales* decision, are nearly identical to those delineated in the regulations governing the present case.  For example, FAR § 9.406.1(a) states that "The existence of a cause for debarment . . . does not necessarily require that the contractor be debarred;" HHS' debarment regulations similarly state that the debarring official "need not debar you even if a cause for debarment exists."  45 C.F.R. § 76.845(a).  FAR § 9.406.1(a) states that "the seriousness of the contractor's acts or omissions and any remedial measures or mitigating factors should be considered in making any debarment decision;" HHS' research misconduct

*Roemer v. Hoffman*, 419 F.Supp. 130, 132 (D.D.C.1976) (because the debarring official failed to explain why he 'attributed little or no importance to [the mitigating factors] and what it was about the offense which necessitates, despite these factors, a debarment of three years," the court concluded that the proceedings were procedurally improper); *accord Silverman v. U.S. Dept. of Defense*, 817 F.Supp. 846, 849 (S.D.Cal. 1993) (holding that debarment was arbitrary and capricious because the agency "essentially failed to consider the mitigating effects" of contractor's record before, and history since, a misdemeanor plea).

Uzelmeier, like Canales, had a spotless record before her alleged misconduct, and *seven*, rather than five, years had passed without incident since her alleged misconduct. Furthermore, Uzelmeier is even more removed from a position in which debarring her might conceivably serve to protect the public interest: Uzelmeier never received her degree, has abandoned the sciences for good, has never applied for or received a government grant or contract, and has no intention of doing so.

In their Motion to Dismiss, Defendants cite *Dr. Paul Langlois*, DAB No. 1409 (1993) for the proposition that cessation of involvement in the sciences is "no basis for reducing a term of debarment." Defs.' Mem. P. & A. at 17. Unlike Ms. Uzelmeier, however, Dr. Langlois asserted a "wish to pursue research again in the future at the earliest time allowed." Also unlike Ms. Uzelmeier, Dr. Langlois had completed his studies and obtained an advanced degree, had been the recipient of federal grants in the past, and was debarred two years, rather than seven

---

regulations likewise state that "[t]he appropriate administrative action is commensurate with the seriousness of the misconduct . . .. HHS considers aggravating and mitigating factors in determining appropriate HHS administrative actions and their terms." 42 C.F.R. § 93.408. FAR § 9.406.1(a) states that the "existence or nonexistence of any mitigating factors or remedial measures . . . is not necessarily determinative of a contractor's present responsibility;" while HHS debarment regulations state: "The existence or nonexistence of any factor . . . is not necessarily determinative of your present responsibility," 45 C.F.R. 76.860.

years, after the initiation of the investigation into his alleged misconduct. While Ms.

Uzelmeier's current life position and stated intention never to return to the sciences is, as

Defendants point out, "not a guarantee that she will not," these facts should have been taken

into consideration as mitigating factors. *See* Defs.' Mem. P. & A. at 18.

Because, like the debarring official in *Canales*, HHS "did not in any way explain [its]

decision to impose debarment rather than a lesser sanction, given the strength of the mitigating

factors," Plaintiff's Cross Motion for Summary Judgment, like Canales' cross motion for

summary judgment, should be granted.

### III.    HHS' FAILURE TO PROSECUTE MS. UZELMEIER'S DEBARMENT WITHIN A REASONABLE TIME RENDERED ITS DEBARMENT MOOT.

In her Hearing Request and in her Motion to Dismiss ORI's Proposed Debarment or in

the Alternative For Leave to File Supplementation, Ms. Uzelmeier argued that the seven years

that had passed between her alleged research misconduct and proposed debarment rendered her

case "stale" and moot, transforming her debarment from an act to protect the federal

government into an improper act of punishment. *See generally* Defs.' Ex. 5 and Pl.'s Ex. 3. As

support for this argument, Ms. Uzelmeier cited the *ABA Guide* at 195 ("[P]assage of time can

give rise to a 'staleness argument,' where the offending conduct occurred so far in the past that it

has little, if any, bearing on "present responsibility") (attached in Pl.'s Addendum at 6); *accord*

*In the Matter of the Proposed Debarment of Nelson Murray*, Docket No. 96-43-DA at *4 (U.S.

Dept of Educ. Office of Hearings and Appeals 1996) (attached in Pl.'s Addendum at 10)

(Acting on the same government-wide debarment regulations as govern this case, the Office of

Hearings and Appeals found that the four-year delay between Mr. Murray's conviction and

debarment "transform[ed] an otherwise act for the protection of the public interest into a form of

punishment that violates the fundamental principle underlying a debarment proceeding." Such a

situation, found the Office of Hearings and Appeals, "cannot be condoned."); *accord David K. Alberta*, AGBCA No. 93-189-7 at *5 (Department of Agriculture Board of Contract Appeals 1994) (attached in Pl.'s Addendum at 17) ("Since no specific time is stated [in the regulations], we find that referral [for debarment] must be made within a reasonable time of when the cause for debarment allegedly occurred." *Accord Roemer v. Hoffman*, 419 F.Supp. 130, 132 (remanded to the decision-maker for consideration of mitigating factors, including the length of time which has passed since the offense).

Administrative Judge Hughes, misconstruing the nature of Ms. Uzelmeier's argument, found that because there was no applicable statute of regulations, she had "no authority to dismiss ORI's action based on timeliness." Defs.' Ex. 2 at 4. However, while a statute of limitations issue was raised, the timeliness issue was not limited to a formal statute of limitations argument, but rather concerned jurisdictional issues such as staleness and mootness. This Court has *de novo* review over this question of law. Although HHS failed to consider the staleness argument, this Court can consider staleness and order the debarment vacated and dismissed because it was moot.

In this case, the "passage of time" precluded any finding of lack of "present responsibility." This is not the case of a person fighting debarment because he wants to reenter government contracting or continue to pursue a career in professions relevant to HHS which may need HHS financial support. Instead, this is a case in which it is uncontested that an accused wrongdoer completely moved on with her life. The "passage of time" radically altered the position of the parties and the legitimate needs of the federal government. The case is stale. MSU completely reviewed the matter and made its findings four years prior to ORI filing its formal charges against Ms. Uzelmeier. During the seven years ORI waited to act, it is

uncontested that Ms. Uzelmeier abandoned any prior professional goals related to HHS funding and/or government contracting.  The allegations and issues are now moot.

Ms. Uzelmeier is contesting her debarment because of the "punishment" she suffers from the stigma of being debarred and the requirement that she disclose the debarment to current and/or future employers.  As part of the debarment, HHS has published information about Ms. Uzelmeier on a government website.  This information  contains the false allegation that she was expelled from her school, and also contains a summary of the grounds HHS used to justify her debarment, such as the allegation that she "committed research misconduct by intentionally and knowingly fabricating and falsifying data." http://ori.dhhs.gov/misconduct/cases/Uzelmeier.shtml.  The HHS debarment statements are accessible to anyone who "Goggles" Ms. Uzelmeier's name, as the first hit on a normal Goggle search.

Placing this information on the World Wide Web does not protect the government purse. It does act to continuously punish Ms. Uzelmeier.  This is the precise harm warned against in the *ABA Guide* and in cases such as In *the Matter of the Proposed Debarment of Nelson Murray*.

This Court should either order the debarment vacated as moot and/or stale or, in the alternative, remand to HHS for consideration of the staleness argument consistent with *Murray*, *Alberta* and *Roemer*.

**PART THREE**

**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
PRIVACY ACT CLAIM MUST BE DENIED**

**I.    DEFENDANTS' MOTION TO DISMISS THE PRIVACY ACT CLAIM IS
PREMATURE.**

HHS' "Statement of Material Facts Not in Genuine Dispute" ("SMF") does not contain a
single reference to Ms. Uzelmeier's claim under the Privacy Act.  Because the D.C. Local Rules
require that a motion for summary judgment "be accompanied by a statement of material facts as
to which the moving party contends there is no genuine issue," Ms. Uzelmeier assumes HHS has
moved solely to dismiss her Privacy Act claim.  *See* LCvR 7(h), 56.1.

"A district court weighing a motion to dismiss asks 'not whether a plaintiff will
ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'"
*Bell Atlantic Corp. v. Twombly*, 550 U.S. ---, 127 S.Ct. 1955, 1969 (2007) (quoting *Scheuer v.
Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).  Ms. Uzelmeier is clearly
entitled to offer evidence to support her claims, as Defendants readily admit when they concede
that "the Privacy Act provides access to individuals [such as Uzelmeier] who are the subjects of
contained in a "system of records."  Defs.' Mem. P. & A. at 7.  Defendants' argument that the
"records sought by Plaintiff here are specifically exempt from the access provision of the Privacy
Act," *id.*, is not one to be decided on a motion to dismiss.  (It strikes Plaintiff as somewhat
bizarre that Defendants moved to dismiss on grounds as flimsy as "ORI's case files *may* include
reports and supporting documents provided to ORI by institutions during and after institutional
inquiries and used by ORI to investigate the allegations [sic] research misconduct."  *Id.* at 8
(emphasis added).)  Granting Uzelmeier "the benefit of all inferences that can be derived from
the facts alleged" as is required, *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C.Cir.2004) (internal

38

quotations committed), it cannot be said that "the complete administrative record relied upon by the HHS as the basis for filing the debarment charge against Rebecca Uzelmeier," Pl.'s Compl. at 6, is exempt from disclosure under the Privacy Act. Consequently, Defendants' motion to dismiss is utterly without merit and must be denied.

If, despite the failure to reference a single Privacy Act issue in its SMF, Defendants' motion is recast as one for summary judgment, it also fails, as premature. A "motion for summary judgment filed by a defendant in a civil action" on a Privacy Act claim must be accompanied by a "detailed declaration[] and Vaughn ind[ex]" including a detailed list of the records searched, the documents withheld, and the reasons for withholding those documents. *Schwarz v. U.S. Dept. of Treasury*, 131 F.Supp.2d 142, 147 (D.D.C. 2000); *accord Savada v. U.S. DOD*, 755 F.Supp. 6, 7 (D.D.C. 19991) (before it would consider defendants' motion for summary judgment, the court required "defendants to submit additional information to justify the withholding of . . . documents, finding the materials supplied as *Vaughn* indices in defendants' first round of filings lacked sufficient supporting details to justify the claimed exemptions from release under . . . the Privacy Act."). The HHS has neither identified the documents responsive to Ms. Uzelmeier's Privacy Act request nor provided sufficient information to justify withholding the documents to which she is entitled, and has consequently not met its burden of proving that the documents are exempt from release under the Act. *See e.g. Savada*, 755 F.Supp. at 9 (to withhold a document to which an individual is entitled under the Privacy Act, the agency must prove that the document is exempt). Consequently, if Defendants' motion is recast as one for summary judgment, it too must fail.

## II.    THE RECORDS AT ISSUE ARE NOT EXEMPT FROM DISCLOSURE UNDER THE PRIVACY ACT.

Defendants now claim that the requested record is exempt from disclosure by waiving the specter that ORI's case files "may" include information compiled in reasonable anticipation of a civil action or proceeding  (Privacy Act exemption 552a(d)(5)); that the record is investigatory material compiled for law enforcement purposes (Privacy Act exemption 552a(k)(2)); and that the record is investigatory material for use in determining eligibility for Federal assistance (Privacy Act exemption 552a(k)(5)).  Defs.' Mem. P. & A. at 8.  As discussed above, Defendants do not come close to meeting their burden of proving the requested records are exempt from release.  *See e.g. Savada*, 755 F.Supp. at 9 (to withhold a document an agency must prove that the document is exempt from release).  Defendants must identify those documents responsive to Uzelmeier's request and release all documents they do not allege to be covered by a Privacy Act exemption, redacting portions if necessary.

 Because in enacting the Privacy Act Congress "desired the 'fullest possible disclosure of agency records'," *Henke v. U.S. Dept. of Commerce*, 1996 WL 692020, *3 (D.D.C. Aug. 19, 1994) quoting *Strang v. U.S. Arms Control & Disarmament Agency*, 864 F.2d 859, 862 (D.C. Cir. 1989), Privacy Act exemptions "must be narrowly construed and their requirements strictly met," *Hernandez v. Alexander*, 671 F.2d 402, 407 (10th Cir. 1982).

As to Privacy Act subsection 552a(d)(5), the MSU Police Report and HHS grant applications clearly did not "c[o]me into being in anticipation of [a] hearing," *Martin v. Office of Special Counsel*, 819 F.2d 1181, 1188 (D.C. Cir. 1987), nor were they "prepared in . . . anticipation" of a hearing, *McCready v. Principi*, 297 F.Supp.2d 178, 189 (D.C.C. 2003) (overturned on other grounds) (refusing to grant access to an *unredacted c*opy of an Office of *General Counsel* Review).  Because Ms. Uzelmeier's administrative record was compiled during

the course of a seven-year investigation into alleged research misconduct and was not prepared

in anticipation of any proceeding, subsection 552a(d)(5) is inapplicable, on its face.[20]  Moreover,

552a(d)(5) is narrower than its Freedom of Information Act counterpart, covering documents

"privileged under the work-product doctrine," but not those "which reflect the deliberative

process of an agency," *Savada*, 755 F.Supp. at 9, nor "civil discovery law," *Martin*, 819 F.2d at

1187.

Furthermore, subsections (k)(2) and (k)(5) of the Privacy Act instruct that investigatory

material *only* be withheld from an individual affected by such records "*to the extent that the*

*disclosure of such material would reveal the identity of a source* who furnished information to

the Government *under an express promise* that the identity of the source would be held in

confidence."[21]  Otherwise, continues 5 U.S.C. 552a(k)(2), "such material *shall* be provided to

such individual" (emphasis added).

As HHS itself puts it in the Federal Register, "section 552a(k)(5) permits an agency to

exempt a system of records which is comprised of investigatory material for use in determining

suitability, eligibility, or qualifications for Federal civilian employment or financial assistance,

*but only to the extent that the exemption is required to prevent revealing a confidential source*."

---

[20]     Ms. Uzelmeier maintains that the bulk of her administrative record was not prepared in anticipation of an administrative proceeding.  It may be, however, that the record does contain documents that were, in fact, prepared in anticipation of the hearing Ms. Uzelmeier was never granted.  That is why the law requires HHS to produce a *Vaughn* index.  Neither Ms. Uzelmeier nor this Court should engage in speculation as to what documents were withheld or what bases may exist to justify the nondisclosure.  Summary judgment or dismissal on the Privacy Act claim is simply premature until such time as a *Vaughn* index is produced.

[21]     Ironically, while subsections (k)(2) and (k)(5) preclude disclosure only "to the extent that the disclosure of such material would reveal the identity of a source who furnished information," the ORI Findings provided to Ms. Uzelmeier in September, 2006 *list the names of the sources* who furnished information to the MSU Police Department, names that are redacted in the version of the police report affixed to Defendants' Motion to Dismiss.  See Defs.' Ex. 3 at ORI Findings at 5; Defs.' Ex. 8 (MSU Police Report) at 5-6, 8.

59 Fed. Reg. 36718 (July 19, 1994) (emphasis added).  "Any information which would reveal the identity of the confidential sources can be redacted under . . . 5 U.S.C. § 552(a)(k)(5), but the balance of these documents must be released."  Savada v. U.S. DOD, 755 F.Supp. 6, 9 (1991).

Section 552a(k)(2) applies to "investigatory material compiled for law enforcement purposes."  By its own terms, however, Ms. Uzelmeier is entitled to her administrative records because "as a result of the maintenance of such material," she was "denied [a] right, privilege, or benefit . . . for which [she] would otherwise be eligible."  Id.[22]

Unquestionably, Defendants' allegations of a blanket exemption under the Privacy Act cannot be supported, neither in a Motion to Dismiss nor in Summary Judgment.  Instead, this Court must require the agency to comply with the requirements of Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973).  Under Vaughn, an agency's motion for summary judgment must be accompanied by a Vaughn Index setting forth a detailed list of the records searched, the documents withheld, and the reasons for withholding those documents.  Only in that way can the parties and the court even begin the process of evaluating the merits of HHS' claims of exemption.  Consequently, this Court must deny Defendants Motion with respect to the Privacy Act and order HHS to promptly produce a comprehensive Vaughn Index.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that this Court deny Defendants' Motion to Dismiss or in the Alternative for Summary Judgment, require that

---

[22]    OMB Guidelines further elucidate subsection (k)(2): "To the extent that such an investigatory record is used as a basis for denying an individual any right, privilege, or benefit to which the individual would be entitled in the absence of that record, the individual must be granted access to that record except to the extent that access would reveal the identity of a confidential source." OMB Guidelines, 40 Fed. Reg. at 28,973.

Defendants properly produce a *Vaughn* index and grant Plaintiff's Cross Motion for Partial

Summary Judgment on Counts 2, 3 and 4 of her Complaint.

                                        Respectfully submitted,


                                        Stephen M. Kohn
                                        D.C. Bar No. 411513

                                        KOHN, KOHN & COLAPINTO, LLP.
                                        3233 P Street, N.W.
                                        Washington, DC 20007
                                        Phone: (202) 342-6980
                                        Fax: (202) 342-6984

                                        Attorney for Plaintiff Rebecca Uzelmeier

Date: November 7, 2007

# PL.'S ADDENDUM



# The Practitioner's Guide to Suspension and Debarment

## Third Edition

Committee on Debarment and Suspension
Section of Public Contract Law
American Bar Association

# THE PRACTITIONER'S GUIDE TO SUSPENSION AND DEBARMENT

## THIRD EDITION

Committee on Debarment and Suspension

2002

Section of Public Contract Law
American Bar Association



**Defending Liberty
Pursuing Justice**

©     Copyright 2002 by the American Bar Association.
The Association has granted the United States
Government a non-exclusive license to reproduce
this document in whole or in part for internal
Government use without payment.

# THE PRACTITIONER'S GUIDE TO SUSPENSION AND DEBARMENT

## THIRD EDITION

### A PROJECT OF THE
### COMMITTEE ON DEBARMENT AND SUSPENSION
### SECTION OF PUBLIC CONTRACT LAW
### AMERICAN BAR ASSOCIATION

## PRINCIPAL AUTHORS[*]

**Richard J. Bednar**, Crowell & Moring, LLP, Editor-in-Chief

**John T. Boese**, Fried, Frank, Harris, Shriver & Jacobson

**Thomas B. Carr**, Baker Botts L.L.P.

**Craig S. King**, Arent Fox Kintner Plotkin & Kahn, PLLC

**James M. McHale**, U.S. Securities and Exchange Commission

**Steven A. Shaw**, Department of the Air Force

**Donald J. Suda**, General Services Administration

---

[*] The views expressed in the following monograph are solely those of the authors and do not reflect the views or positions of the organizations with which the authors are affiliated, the American Bar Association, or the ABA Section of Public Contract Law. The monograph is intended to be a reference work and does not constitute legal advice.

# PROFESSIONAL CONTRIBUTORS

**Barbara E. Butterworth**, Crowell & Moring, LLP

**Brian T. Fisher**, McKenna Long & Aldridge, LLP

**Frank S. Lane**, U.S. Environmental Protection Agency

**Frederic M. Levy**, McKenna Long & Aldridge, LLP

**Dorn C. McGrath, III**, Reed Smith LLP

**Robert M. Meunier**, U.S. Environmental Protection Agency

**John J. Pavlick, Jr.**, Venable Law Firm, Chair, Debarment & Suspension
Committee

**David M. Sims**, U.S. Environmental Protection Agency

**O. Kevin Vincent**, Baker Botts L.L.P.

**Jeffrey C. Walker**, Miller & Chevalier, Chartered

# ADMINISTRATIVE SUPPORT

**Phyllis Avant**, Crowell & Moring, LLP

**Shirley Lambert**, Baker Botts L.L.P.

**Debbie Goodwin**, Fried, Frank, Harris, Shriver & Jacobson

**Sarah E. Mowatt**, Crowell & Moring, LLP

**Robert Sherman**, Crowell & Moring, LLP

agency at an early juncture and request an opportunity to present information and argument.

Many agencies are also willing to meet with contractors to discuss present responsibility issues, even in the absence of an investigation or judicial proceeding. They may be willing to meet, for example, during the conduct of a company's due diligence in connection with a planned merger or acquisition. Some agencies are willing to provide an informal "advisory opinion" as to the likelihood that a debarment proceeding would be initiated against the acquiring entity, based upon the conduct of the company to be acquired.

2.    **Presentation of Matters in Opposition**

The FAR and Common Rule provide that within 30 days of receipt of the notice a respondent may present information or argument in opposition to a suspension or proposed debarment.  This may be done in person, in writing, or through a representative.[283]

An important first step for the respondent is to discover the basis for the agency's action by requesting a copy of the evidence relied upon by the suspending or debarring official in making the determination (the "administrative record").[284] There are limited circumstances when the entire administrative record will not be disclosed, such as where disclosure might compromise an ongoing criminal investigation.[285]

---

[283]    FAR 9.406-3 (c)(4) and 9.407-3 (c)(5); Common Rule §§ __.725(a) and __.820(a).

[284]    Some agencies provide the full administrative record with the notice.  More often, however, to avoid administrative burden, the agencies provide the full administrative record only in those cases where it is requested.

[285]    The respondent will not usually be afforded access to information outside the administrative record such as that afforded by deposing Government officials or investigators.  Other documents not part of the administrative record might be acquired through procedures unrelated to suspension or debarment, such as those relating to the Freedom of Information Act or the Privacy Act, 5 U.S.C. § 552 (a).

may use the term "shall," they are only advisory since they provide no penalty for failure to act within the time limits that the regulations specify.

Finally, the issue of passage of time can give rise to a "staleness" argument, where the offending conduct occurred so far in the past that it has little, if any, bearing on "present responsibility." That is distinguishable from a statute of limitations issue.

## 2.    Challenges Based on Inadequate Grounds for Suspension

Agencies have occasionally cited grounds that are simply too trivial to support suspension or debarment.[614] Similarly, a respondent may review the facts underlying a notice to determine whether they raise a staleness issue, although the passage of time does not necessarily eliminate the basis for debarment.

## 3.    Challenges Based on the Duration of Suspension or Debarment

The period of debarment must be commensurate with the seriousness of the cause for debarment.[615] As a general matter, debarment should not exceed three years, except that debarment for violating the Drug Free Workplace Act may be for a period of up to five years.[616] However, the FAR and the Common Rule do not limit the period of debarment to three years.  Longer periods of debarment may be imposed under the rules "where circumstances warrant".  In one case, a court found that an agency's decision to debar a contractor for fifteen years was reasonable.[617]

---

(...continued)

[613]    Id., at 237.

[614]    See, e.g., Timken v. Vaughan, 413 F. Supp. 1183 (N.D. Ohio 1976).

[615]    FAR 9.406-4(a).

[616]    Id.

[617]    Coccia v. Defense Logistics Agency, Civ. A. No. 89-6544, 1992 WL 345106 at *5 (E.D. Pa. Nov. 12, 1992) ("[A]lthough a debarment generally is imposed for three years, there is no

(continued...)

UNITED STATES DEPARTMENT OF EDUCATION
WASHINGTON, D.C. 20202

_____

In the Matter of the Proposed Debarment of        **Docket No. 96-43-DA**

**NELSON MURRAY,**                    Debarment Action

            Respondent.

_____

Appearances: Nelson Murray, pro se

Russell B. Wolff, Esq., Office of the General Counsel, United States
Department of Education, Washington, D.C., for the Office of Student
Financial Assistance Programs.

Before: Chief Administrative Law Judge Allan C. Lewis

DECISION

On April 29, 1996, Mr. Nelson Murray was issued, pursuant to 34 C.F.R. § 85.312, a
Notice of Proposed Governmentwide Debarment from Federal Procurement and
Nonprocurement Transactions which alleged that his conviction for the obstruction of a
federal audit and the filing a false statement with the Internal Revenue Service
constituted cause for debarment under 34 C.F.R. §§ 85.305 (a)(1), (a)(3), (a)(4), (b), and
(d). Mr. Murray filed a timely opposition to the proposed debarment. Mr. Murray set
forth six grounds which, in his view, precluded the proposed action by the Department's
Notice Debarment and Suspension Official (Notice DSO). Thereafter, the undersigned
issued an order which requested the parties to submit any additional documents and
evidence and a brief on the issues raised in Mr. Murray's opposition. The order also set a
date for an oral argument. Mr. Murray failed to respond to the order and did not appear at
the oral argument. The Department filed a short brief and appeared at the oral argument
where it urged a debarment for a period of three years.

1. Facts

The facts are undisputed. Mr. Murray was employed as the Director of Management
Services with the USA Training Academy. On or about May 10, 1988, Mr. Murray filed
a false 1987 federal income tax return in which he understated his income by
approximately $1,000 to $2,500. This amount was given to him in $20 and $50's bills by
a senior officer of the school as "tips" for delivering substantial sums of money illegally

diverted to the senior officers of the school. In addition, between March and April of 1989, Mr. Murray endeavored to obstruct and impede federal auditors from the Department in the performance of an audit of the USA Training Academy by instructing another employee to remove approximately 5,000 student records from the computer system thereby disguising the extent of the school's failure to pay timely tuition refunds.

On October 13, 1989, Mr. Murray entered into a plea agreement with the authorities under which he agreed to plead guilty to the obstruction of a federal audit and the filing of a false income tax return. The agreement provided, in addition, that Mr. Murray would provide complete, honest, and truthful testimony at any trials at which his testimony would be relevant.

Ultimately, Mr. Murray was charged in an information issued on or about April 17, 1992. Thereafter, on July 14, 1992, Mr. Murray entered a plea of guilty to the charges in the information and his plea agreement was accepted by the Federal district court. The Federal district court imposed probation for a period of three years. This sentence was less than the guideline range and was based upon a request by the government due to the substantial assistance provided by Mr. Murray.

Three months later, in October 1992, the Department's Deputy Assistant Inspector General for Policy, Planning and Management Services requested the Acting Notice DSO to initiate a debarment action against Mr. Murray based upon his conviction. Within four weeks, however, the Deputy Assistant Inspector General withdrew the request and the Notice DSO apparently concurred in this request. According to the Department's representative, Mr. Murray was a potential witness and a source of information in the civil and criminal matters involving the major operators of USA Training Academy. The withdrawal was made in order to await the completion of these proceedings. Mr. Murray was not informed of the proposed debarment action or the decision to cease its prosecution in October 1992. These civil and criminal matters were completed by June 1994 and resulted, inter alia, in a recovery in excess of $20 million by the Department.

Two years after the completion of the proceedings against Mr. Murray's superiors and almost four years after his sentencing, the Assistant Inspector General made a belated request on April 2, 1996, for a "[r]e-initiation" of the debarment action against Mr. Murray stating that the resumption of the debarment proceedings "would not be detrimental to any judicial proceeding [concerning his superiors] and would therefore be appropriate at this time." As explained by counsel for the Department, the two-year lapse between the completion of the civil and criminal matters and the instant action was caused by negligence on the part of the Department and that the reinitiation of the debarment proceeding was launched only after a newly appointed official questioned why no action had been taken against Mr. Murray.

2. Opinion

In his letter of protest against the proposed debarment, Mr. Murray raises several points which, when taken as a group, question whether this action is timely and justified. He maintains that the debarment is only valid for a period of five years; that he has served this time; and that he has not had any dealings with the Department or any other Federal agency. In addition, Mr. Murray indicates that he was not advised of the possible debarment when he met with the officials of the Department and the U.S. District Attorney; that he assisted the Department in every way possible and that he was assured that he "was not the person they wanted."

The Department responds that there is no statute of limitations on the commencement of a debarment action. It also argues that the equitable equivalent of the statute of limitations, the doctrine of laches, does not apply. In the Department's view, it may maintain a debarment action at any time after the cause arises -- even many years after the cause. In effect, the Department argues that Mr. Murray is considered a present threat to the public interest due to his conviction some four years ago and the serious nature of his offense.

Debarment proceedings are initiated due to the Federal government's desire to protect the public interest by conducting its business only with responsible persons. 34 C.F.R. § 85.115(a). As explained in the implementing policy letter, the serious nature of debarment "requires that these sanctions be imposed only in the public interest and not for the purpose of punishment." Office of Federal Procurement Policy Letter 82-1, 47 Fed. Reg. 28,854(1982). This concept is well established and recognized in the Department's regulations and the case law. 34 C.F.R. § 85.115(b); see, e.g. Roemer v. Hoffmann, 419 F.Supp. 130 (D.D.C. 1976), W. George Keat, et. al., AGBCA No. 84-292-7, 85-3 BCA P 18,198. The period of protection of the public interest is commensurate with the seriousness of the cause and the period of debarment generally, with the exception of the criminal drug statutes, should not exceed three years. 34 C.F.R. § 85.320(a). The initial period of protection may only be extended upon a showing of new, significant transgressions. 34 C.F.R. § 85.320(b).

The Secretary's regulations establish three points of policy pertinent herein. First and most importantly, a debarment is not to be used for the purpose of punishment. Rather, it is employed to protect the public interest. Second, as to the period of debarment, the line of demarcation between the protection of the public interest and punishment is generally three years. Third, even in the most outrageous situations, a debaree is considered fit to do business with the Federal government upon the expiration of the debarment period absent any new, significant transgressions.

As of October 1992 when the initial debarment request was made, Mr. Murray was clearly a candidate for debarment. He had plead guilty to a felony -- the obstruction of a Departmental audit of a proprietary school -- an offense which constituted cause under 34 C.F.R. § 85.305(a)(3).See footnote 1 [1] The nature of the offense was serious and could warrant nearly the maximum three year period of debarment absent the presence of extenuating circumstances which, based on this record, may or may not have been present.

In the instant case, the appropriate time to prosecute a debarment action was immediately following the conviction of Mr. Murray in July 1992 as originally pursued by the Department in October 1992. Such an action would have protected the public interest by precluding Mr. Murray from conducting business with the Federal government through October 1995. The present action was instituted, however, some four years after his conviction and six months after Mr. Murray would have been considered, once again, fit to conduct business with the Federal government if he had been debarred in a timely fashion. This four-year delay transforms an otherwise act for the protection of the public interest into a form of punishment and violates the fundamental principle underlying a debarment proceeding.See footnote 2 [2] Such a situation cannot be condoned. Accordingly, the proposed debarment of Mr. Murray is denied.


Allan C. Lewis
Deciding Debarment and Suspension Official

Dated: August 15, 1996

---


SERVICE

A copy of the attached decision was sent on August 15, 1996, by certified mail, return receipt requested to the following:

Nelson Murray
1800 Chelmsford Cr.
Newark DE 19713

Russell Wolff, Esq.
Office of the General Counsel
U.S. Department of Education
600 Independence Avenue, S.W.
Washington, D.C. 20202-2110

Linda Duby, Paralegal Specialist
Compliance and Enforcement Division
Student Financial Assistance Programs
Office of Postsecondary Education
U.S. Department of Education
600 Independence Avenue, S.W.
Washington, D.C. 20202-4531

---

*Footnote: 1*    [1] *The false statement on his 1987 tax return is a relatively insignificant matter in this case.*

---

*Footnote: 2*    [2] *The Department's explanation for its initial failure to prosecute Mr. Murray -- to await the completion of the civil and criminal actions against his superiors -- cannot justify or excuse the delay of the action against him. A debarment action is designed to protect the public interest with respect to a particular individual. Thus, a delay predicated upon this individual's assistance in other matters not affecting him directly, while it may well serve some other Federal interest, does not serve to protect the public interest from this particular individual.*

94-2 BCA P 26923, AGBCA No. 93-189-7, 1994 WL 161893 (Ag.B.C.A.)

AGBCA

DAVID K. ALBERTA, Appellant

April 25, 1994

Representing the Appellant:
David A. Linn
Linn, Lindley & Blate
Attorneys At Law
P.O. Box 2347
Oakhurst, California 93644
Representing the Government:
Lori D. Polin
Office of the General Counsel
U. S. Department of Agriculture
Room 4622 South Building
14th & Independence Avenue, S.W.
Washington, D.C. 20250-1400

DECISION OF THE BOARD OF CONTRACT APPEALS

OPINION BY ADMINISTRATIVE JUDGE MARILYNN M. EATON

This appeal involves the 3-year debarment of David K. Alberta of Coarsegold,
California (Appellant) by the Forest Service, U. S. Department of Agriculture. The
action was based on Appellant's plea of guilty to marking and cutting National
Forest timber.

Appellant asserts that the Forest Service did not properly consider his present
responsibility, in that the illegal activities occurred in July 1990, but the
Notice of Debarment was not issued until April 1993. Appellant also challenges the
action on grounds that he was not advised by the U.S. Magistrate or the Forest
Service that a guilty plea could be grounds for debarment and that the 3-year term
is in excess of that recommended by the Supervisor of the Sierra National Forest,
California.

The parties agreed to a decision on the record, and each submitted briefs. Under a
delegation from the Secretary of Agriculture, the Board has jurisdiction to hear
and determine "the issue of debarment and the period thereof" on an appeal by a
timber purchaser debarred by an authorized official of the Forest Service. 7 CFR §
24.4(d)(2).

FINDINGS OF FACT

1. The Forest Service awarded the Hooker II Salvage Sale, Contract No. 054179, to
Appellant on June 19, 1990; sale price was $3,975.25 (Appeal File (AF) 50). The
Turkey II Salvage Sale, Contract No. 054187, was awarded to Appellant on the same
date; sale price was $6,864 (AF 23). Both sales were in the Minarets Ranger
District of the Sierra National Forest. Termination dates were August 3 and August

11, 1990, respectively. (AF 23, 50.)

2. On July 31, 1990, a Forest Service special agent signed U.S. District Court
Violation Notices charging Appellant, as operator of the Hooker II sale, with
violation of the following regulations:
    36 CFR 261.6a, which prohibits "Cutting or otherwise damaging any timber, tree
    or other forest product except as authorized by special use authorization,
    timber sale contract, or Federal law or regulation," and
    36 CFR 261.6d, which prohibits "Stamping, marking with paint, or otherwise
    identifying any tree or other forest product in a manner similar to that
    employed by forest officers to mark or designate a tree or any other forest
    product for cutting or removal."
(AF 20-21.)

3. Statements of Probable Cause indicated that on July 22, 1990, the Forest Service
had taken samples of suspect paint left on stumps and decked logs. Field tests did
not show a tracer element present in Forest Service paint, and timber having non-
tracer paint had been marked and cut. (Id.)

4. Also on July 31, 1990, the special agent signed Violation Notices charging
Appellant, as operator of the Turkey II sale, with violation of the same
regulations, based on paint samples taken July 29, 1990 (AF 17-18).

5. On January 31, 1991, in the U.S. District Court for the Eastern District of
California (Case No. 91-2011), Appellant entered a plea of guilty to violation of
the cited regulations on two counts each. On Government motion, six additional
counts were dismissed. (AF 14-15.)

6. Appellant was ordered to pay a fine of $500 and a penalty assessment of $40
within 30 days; to obey all laws; and to pay $8,000 to the Forest Service at the
rate of $1,000 a month beginning May 31, 1991. In addition, Appellant was placed on
unsupervised probation for 2 years. (Id.)

7. On July 10, 1992, the U.S. Attorney acknowledged Appellant's satisfaction of the
criminal fine, penalty assessment, and restitution and instructed the clerk of the
court to enter a Satisfaction of Judgment (Appellant's Supplement to the AF
(Supp.).

8. On September 11, 1992, the Director of Timber Management for Forest Service
Region 5 referred to the Chief of the Forest Service a recommendation for
suspension and debarment made by the Sierra National Forest. The letter of
transmittal stated that Appellant had pled guilty to four of ten counts of timber
theft and that six additional counts had been dismissed. (AF 9.)

9. The recommendation itself, dated May 18, 1992, and signed by the Supervisor of
the Sierra National Forest, was that Appellant should be debarred for a minimum of
18 and a maximum of 24 months. The Forest Supervisor stated that Appellant had been
purchasing small timber sales, less than 100 thousand board feet (MBF), for
approximately 4 years, and had been cited for cutting without a permit on one
previous occasion, December 1989, when he paid a fine of $50 and damages of
$1,610.34. The Forest Supervisor further stated that the Forest Service had stopped
accepting applications from Appellant for non-competitive sales; however, Appellant

continued to bid on and be awarded competitive timber sales. (AF 11-12.)

10. On November 3, 1992, the Deputy Chief of the Forest Service, the designated Debarring Official, issued a Notice of Proposed Debarment for a term not to exceed 3 years. The notice stated that it was based on the administrative record and was in accordance with 36 CFR Part 223, Subpart C; it specifically referenced the Hooker II and Turkey II Salvage Timber Sales. Appellant was afforded 30 days in which to submit information opposing or mitigating the proposed action or to request an informal hearing. (AF 1.) Appellant did not do so.

11. On April 1, 1993, the Debarring Official notified Appellant of his debarment from participation in, i.e., bidding on or award of, National Forest timber sales until November 3, 1995,[FN1] finding that the record established, by a preponderance of the evidence, that Appellant was "not presently responsible" to do business with the Government (AF 1).

12. On April 30, 1993, Appellant appealed the debarment to the Board. The appeal was docketed as AGBCA No. 93-189-7. In accordance with the Rules of Procedure applicable to appeals under 7 CFR § 24.4, Appellant filed a Complaint and the Government filed an Answer and Appeal File. (Correspondence File.)

13. On December 17, 1993, Appellant supplemented the Appeal File. In addition to a copy of the Satisfaction of Judgment, Appellant offered documents showing that, following the guilty plea, he continued to do business with the Forest Service. These documents included:
  A Road Use Permit, issued to Appellant, for truck haul of saw timber from the Beasore Meadows area on a Forest Development road in the Minarets Ranger District. The permit was approved July 23, 1993, and terminated December 15, 1993;
  A Forest Products Sale Permit and Cash Receipt, issued to Appellant, for the Port Timber Sale Area, also in the Minarets Ranger District. The permit covered the period October 22, 1992, to November 15, 1992, and acknowledged payment of $863.16;
  A second Sale Permit and Cash Receipt, issued to Appellant on October 21, 1992, which acknowledged payment of $1,770;
  Forest Service computer printouts which showed that the Hooker II Salvage Sale had been closed on August 1, 1991; and
  A "Certification of Nonsubstitution of Timber Purchased and Disposition of Domestically Processed and Exported Timber, Forest Service Form 2400-43," dated April 8, 1991. The form had been submitted in connection with Appellant's bid for the Ranchero Timber Sale.
(Supp.)

14. By letter dated January 28, 1994, the Government advised the Board that it had no objection to the Appellant's Appeal File supplements (Correspondence File).

DISCUSSION

Jurisdiction and Scope of Review

In its brief, the Government for the first time argues that the Board is limited to an Administrative Procedure Act review of whether, on the basis of the record

before the Debarring Official, the Forest Service action was arbitrary and
capricious. Appellant responds that all relevant information that was available to
the Debarring Official, including that submitted directly to the Board, should have
been taken into consideration by the Debarring Official.

We disagree with the Government's view of the scope of our review. The regulation
under which USDA's Office of Administrative Law Judges considers appeals of non-
procurement debarments and suspensions (other than timber sales) specifically
states that the appeals officer will base his or her decision solely on the
administrative record. 7 CFR § 3017.515(b). By contrast, the regulation under which
the Board is authorized to "hear and determine the issue of debarment and the
period thereof" on appeals by purchasers of National Forest timber contains no such
limitation. 7 CFR § 24.4(d)(2).

In its Answer, the Government acknowledged the Board's jurisdiction pursuant to 7
CFR § 24.4(d)(2). Moreover, the Government has not previously questioned the
Board's authority to conduct a de novo review in appeals by debarred timber
purchasers, either under 7 CFR § 24.4 or the preceding regulation, 7 CFR § 2400.4.
See Dale J. Leavitt, et al., AGBCA No. 77-135, 79-1 BCA ¶ 13,802 (following hearing
before Debarring Official, parties participated in a 3-day evidentiary hearing
before Presiding Judge, and counsel then presented oral arguments to full Board
panel); Verel C. Morrell and Gregory Lumber Company, AGBCA No. 421, 74-2 BCA ¶
10,722 (parties participated in evidentiary hearing before Board).

Most importantly, at the time Appellant supplemented the Appeal File, the
Government specifically advised the Board that it had no objection (Finding of Fact
(FF) 14). In accordance with Board Rule 5(d), in the absence of any objection,
these documents are part of the record on which the Board's decision is based.

Finally, Appellant's failure to oppose the action at the Debarring Official's level
does not preclude the Board's consideration of the supplemental documents (although
we do not decide, as Appellant argues, that it was up to the Government to provide
these documents to the Debarring Official). In an appeal involving debarment of a
Forest Service procurement contractor, we recently stated that we regarded a
similar informal hearing before a Debarring Official as more in the nature of
settlement negotiations than an administrative remedy which must be exhausted. See
Donald Cooley, dba Mojave Equipment Company, and Mojave Equipment Sales, AGBCA No.
93-202-7, 1993 WL 267112 (July 19, 1993).

Appellant's Present Responsibility

Turning to the merits of the appeal, Forest Service regulations clearly state that
conviction is cause for debarment of timber purchasers. 36 CFR § 223.137(a).
Conviction is defined as a judgment or conviction of a criminal offense by any
court of competent jurisdiction, "whether entered upon a verdict or a plea, and
includes a conviction entered upon a plea of nolo contendere." 36 CFR § 223.133.
Appellant is charged with constructive notice of regulations published in the Code
of Federal Regulations. Sho-Ge, Inc., AGBCA No. 89-156-1, 89-2 BCA ¶ 21,675; Doris
Bookout, AGBCA No. 89-147-1, 89-1 BCA ¶ 21,570. We also note that Appellant was
represented by counsel. Failure of the U.S. Magistrate or Forest Service officials
to inform Appellant of the consequences of his guilty plea thus provides no reason
to overturn the debarment.

Debarment, however, is justified only if a contractor is not presently responsible. W. George Keat, et al., AGBCA No. 84-292-7, 85-3 BCA ¶ 18,198. Responsibility is a term of art in Government contract law; it refers not only to the contractor's ability to complete performance successfully, but also to his or her honesty and integrity. See Romer v. Hoffman, 419 F. Supp. 130 (D.D.C. 1976). It is well established that the purpose of debarment is not to punish the contractor for past bad acts, but rather to protect the Government from present and future business dealings with a contractor who has been shown to lack responsibility. Id.; W. George Keat, et al., supra; Forest Development Corporation, et al., AGBCA 80-115-7, 80-2 BCA ¶ 14,795.

The primary question before the Board, therefore, is whether conviction in January 1991--of violations that occurred in July 1990--provides a valid indicator of Appellant's lack of present responsibility, justifying continuation of the debarment for a full 3 years.

Appellant contends that present responsibility is demonstrated by the fact that while he continued to transact business with the Forest Service for an extended period after the conviction, "no problems arose, no contract breaches were alleged, and no complaints were lodged." Legal theories advanced by Appellant include laches, based on the Forest Service's failure to propose debarment within a reasonable time, and estoppel, based on Appellant's reliance on Forest Service inaction during the intervening years.

The Government responds that although personnel on the Sierra National Forest were aware of Appellant's conviction, debarment was not recommended until the matter came to the attention of "adequately trained" personnel in the Forest Supervisor's office. The Government does not otherwise rebut Appellant's contention that, following the conviction, he continued to participate in timber sales with Forest Service knowledge and consent. In our opinion, the fact that some Forest Service personnel failed to recognize Appellant's conviction as cause for debarment is an internal Forest Service problem. Forest Service personnel also are charged with constructive, if not actual, knowledge of their own regulations.

With regard to the length of time between conviction and debarment, the Government asserts that there is no statute of limitations for debarment actions. Under Forest Service regulations, however, information which "may be sufficient cause for debarment of a timber sale purchaser" is required to be referred to the Debarring Official. 36 CFR 223.138(a). Since no specific time is stated, we find that referral must be made within a reasonable time of when the cause for debarment allegedly occurred. If the Forest Service intends only that debarment actions should be initiated within a reasonable time after referral to the Debarring Official, as the Government now argues, the regulations may be amended to so state. See W. George Keat, et al., supra.

On July 10, 1992, a Satisfaction of Judgment, stating that Appellant had paid all fines and penalties and made restitution, was entered in U.S. District Court (FF 7). These are mitigating factors that, under 36 CFR § 223.136(a), the Debarring Official was required to consider. The record does not demonstrate that he in fact did so. See Romer v. Hoffman, supra (debarment may not be effected by inferring, from a conviction 3 years ago, that an individual is not a good business risk; agency must look closely at circumstances surrounding the offense, the effect of suspension and payment of fines, the length of time since the offense and

conviction, and the debarred individual's character since then). This Board cited Romer v. Hoffman with approval in Stevens Food, Inc., et al., AGBCA No. 79-187-7, 81-1 BCA ¶ 14,960, and Fred H. Bender, et al., AGBCA No. 76-149, 79-1 BCA ¶ 13,801.

Appellant may have the initial burden of proving present responsibility. In this case, however, Appellant's continued business transactions with the Forest Service, with absolutely no evidence of further bad acts, and entry of the Satisfaction of Judgment, shifts to the Government the burden of proving that Appellant lacks present responsibility. The Government cannot meet this burden merely by inferring, as it has here, lack of present responsibility from Appellant's conviction in January 1991.

Term of the Debarment

The term of Appellant's debarment began with the Notice of Proposed Debarment on November 3, 1992 (FF 11). If, pursuant to decision of this Board, the debarment is ended effective April 30, 1994, Appellant will have been precluded from bidding on or being awarded timber sales for a period of approximately 18 months. In accordance with the recommendation of the Supervisor of the Sierra National Forest (FF 9), we find this sufficient protection for the Government.

Addendum

Additional legal theories advanced by Appellant include alleged discrimination, based on the number of Forest Service timber sale debarments prior to 1992, and violation of Appellant's rights under the Equal Protection clause. In view of our decision, and in the spirit of judicial restraint, we do not reach these constitutional questions.

DECISION

The term of Appellant's debarment is reduced. Appellant shall be removed from the list of debarred bidders for National Forest timber effective April 30, 1994.

MARILYNN M. EATON

Administrative Judge
Concurring:

EDWARD HOURY

Administrative Judge

SEAN DOHERTY

Administrative Judge

FN1 The Notice of Debarment was internally inconsistent in that it stated it was effective as of the dates of both the Notice of Proposed Debarment and the Notice of Debarment. It did, however, indicate that the term of debarment was for 3 years, or until November 3, 1995.

 94-2 BCA P 26923, AGBCA No. 93-189-7, 1994 WL 161893 (Ag.B.C.A.)
END OF DOCUMENT

# PL.'S EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| REBECCA UZELMEIER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Civil Action No. 07cv753 |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HEALTH AND HUMAN SERVICES, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### AFFIDAVIT OF REBECCA UZELMEIER

1.    In 1999, I was a Ph.D. candidate at Michigan State University ("MSU" or "University") in the Department of Pharmacology and Toxicology.

2.    My advisor was Professor Norbert Kaminski ("Kaminski").

3.    I had a number of major differences with Kaminski.  In or about the summer of 1999, I learned that Kaminski had accused me of misconduct and filed charges against me with the University Intellectual Integrity Officer.

4.    In or about July 1999, I became aware that MSU had launched an investigation into the Kaminski allegations.

5.    I immediately realized, based on the nature of the allegations against me, that I needed expert testimony.  Only with outside objective experts would I be in a position to rebut the allegations raised by Kaminski.

6.    Additionally, given Professor Kaminski's position within the University – especially when compared to my own – I doubted that the University would take my word over his without strong corroborating independent expert testimony.

1

7.    I contacted Dr. Frederic Whitehurst in order to retain an expert.  Dr. Whitehurst has a Ph.D. in Chemistry from Duke University, a J.D. from Georgetown University, and had worked as an FBI agent and as a scientist within the FBI crime lab.  Dr. Whitehurst was running a Forensic Justice Project, in which he incorporated his scientific skills with his law enforcement background.  He also was in a position to retain other scientists, should specialized information be needed to conduct a credible analysis.

8.    Dr. Whitehurst agreed to be retained as my independent expert.

9.    In or about October of 1999, I requested that Dr. Whitehurst have full access to investigate the lab, its equipment, and to talk with witnesses.  The MSU investigation relied on these sources as the basis of the allegations against me. MSU refused to grant this request.

10.   Subsequently, I made the request on two other occasions.  Neither request was granted.

11.   On page 49 of MSU's Investigation Report, MSU explained that it had rejected my request in order to avoid embarrassment. Bringing in the Whitehurst Team, said MSU, "could very well have the effect of punishing Professor Kaminski for making the allegations of scientific misconduct against Ms. Marcus.  The punishment would take [sic] the effect of further disrupting the activities of his laboratory."

12.   This finding makes no sense whatsoever.  I wanted to retain an expert in order to rebut the allegations raised against me by a powerful professor at the University, not to "punish" that professor.

13. I do not know how Dr. Whitehurst's expert analysis could have punished Kaminski. However, MSU blocked my requests to retain an expert to review the evidence the University was compiling against me.

14. I understand that Dr. Whitehurst's team included a quality assurance expert who would have reviewed MSU's quality assurance documentation program to see whether it was in compliance with MSU's obligations under federal law. It is clear that MSU did not want any oversight review of its document control system.

15. MSU had no system to protect the integrity of documents, nor any security over documents, nor any way of monitoring access to the documents. MSU's flawed quality assurance documentation program was unquestionably one of the root causes of the controversy concerning issues with my documentation.

16. After MSU rejected my request for an outside expert, they continued to conduct an investigation. I understood that this so-called investigation was required to be completed within 120 days under the rules in effect in 1999.

17. It became obvious that MSU would not complete its review in a timely fashion and that my career in science was effectively over. Without a prompt rebuttal to the Kaminski allegations, the issues raised by him would linger on, placing me in limbo.

18. If Kaminski's allegations were not promptly dismissed, the badmouthing that would inevitably arise within any scientific community in which I might seek employment would effectively render me unemployable within the scientific community.

3

19. My expectation that MSU would take years to complete its review were well-founded. In fact, MSU took over two and-a-half years to issue its report.

20. Based on my belief that MSU would not conduct a fair investigation, and based on my assessment of the impact of the MSU allegations on my career in science, I voluntarily withdrew from MSU in the fall of 1999.

21. I was not expelled from MSU. The notice on the HHS website stating that I was expelled is not accurate and further harms my reputation.

22. Frankly, I am surprised that MSU released even inaccurate information about my academic standing to an outside party, because it refuses to release my academic transcript to me.

23. Given my age (27 at the time) I decided that I should move on with my life and put the events from MSU behind me. This was a very difficult decision, but it was based on my belief that the MSU process would not be fair, and would be prolonged and expensive.

24. In the fall of 1999, I made the painful decision to leave the sciences and change my career.

25. On September 12, 2006, more than seven years after HHS learned of my scientific dispute with MSU, I received notification from ORI that it was proposing "findings of misconduct in science against [me] based upon accumulated evidence including the [MSU Report], dated March 5, 2002, and additional analysis and information obtained by the ORI during its oversight review of the MSU Report."

26. ORI never sought my input on the so-called "additional analysis and information" it had obtained.

27. As a result of the ORI "findings," the Debarring Official proposed debarring me for a period of five (5) years.

28. On September 14, 2006, pursuant to the Privacy Act, 5 U.S.C. § 552a(d), I had my counsel ask HHS to provide me with a copy of "all documents referenced in the charge against Rebecca Uzelmeier, dated September 6, 2006, but which were not attached to said charge."

29. On or about September 19, 2006, I asked HHS to provide me with a copy of "the complete administrative record relied upon by the HHS as the basis for filing the debarment charge against" me.

30. I wanted these documents because they formed part of the actual basis for the proposed debarment. I wanted to review not just the report, but all of the documents which formed the basis of that report. I also wanted to provide this information to an expert witness in order to fully and finally offer a complete rebuttal to the allegations raised by MSU and now additional allegations raised by ORI.

31. Again, it was my firm belief that access to these materials was absolutely imperative so I could again retain an expert and prepare a complete defense.

32. I understand that HHS refused both of these requests. Because of these refusals, my ability to rebut the allegations against me was severely prejudiced.

33. I instructed my counsel to request leave to file a supplemental answer in order to have the time to obtain the full record and have that record reviewed by an expert.

34. In fact, I again retained Dr. Whitehurst as my expert witness and he informed me that he was available to conduct the review.

35. On or about March 5, 2007, the HHS Departmental Appeals Board (DAB) issued an opinion dismissing my hearing request on the grounds that I failed to "meet the regulations' specificity requirements," or "raise a genuine issue of material fact or law that may be properly addressed in a hearing."

36. ORI subsequently sent me a letter, dated March 12, 2007, stating that "[a]s a result of this decision, the Office of Research Integrity's findings of research misconduct and proposed 5-year debarment period are now final."

37. Being debarred has a profound impact on my life. In addition to the wholly unwarranted humiliation and damage to my reputation, debarment may have a negative impact on the progression of my current career.

38. I understand that some employers are reluctant to hire a debarred person, especially one accused of the types of allegations leveled at me by MSU and ORI.

39. Furthermore, I risk being denied professional designations and license renewals because of my status as a debarred person—in particular, I risk being denied the Certified Financial Planner designation, a critical designation in my field.

40. The debarment has harmed my reputation and it is public information on the World Wide Web.

6

41. I withdrew from the graduate program at MSU in 1999 and did not receive my Ph.D. I have not subsequently obtained any other science-related degrees or licenses.

42. By March of 2002, when MSU finally completed its investigation into my alleged misconduct of 1999, I had left the sciences, severed all connections with the scientific community, and begun a new career as a financial analyst.

43. After leaving MSU, I married my current husband and had one child.

44. I do not work in a science-related field and do not intend to do any science-related work in the future.

45. I have never applied for or received a government grant or contract and I have no intention of doing so in the future. Since leaving MSU, I have not been involved with any HHS committees or projects, nor do I have any interest or intention of doing so in the future.

46. Since leaving the Ph.D. program at MSU, I have not worked as a federal contractor or knowingly received payment, directly or indirectly, from a government grant, nor do I intend to do so in the future.

47. I have reviewed the Request for Hearing filed by my attorneys on October 11, 2006. To the best of my knowledge and belief everything in that request is true and correct.

48. I have reviewed the police report filed as Defendants' Exhibit 8. That report is not accurate. I never informed any person that my larceny report was "unfounded." The statement in that report is not true. I did not file a false police report.

49. I have reviewed Defendants' Statement of Facts. Paragraphs three and six are inaccurate and misleading. After I learned that my files had been tampered with or were missing, I took other files to my attorney for safekeeping. At my direction, he returned all the files to the University during the course of the proceeding.


_Rebecca Marcus Uzelmeier_          _11/5/2007_

Rebecca Marcus Uzelmeier                    Date

**PL.'S EXHIBIT 2**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| REBECCA UZELMEIER,                 )<br>                                 )<br>           Plaintiff,       )<br>                                 )<br>       v.                 )<br>                                 )<br>UNITED STATES DEPARTMENT OF   )<br>HEALTH AND HUMAN SERVICES, et al. )<br>                                 )<br>                                 )<br>       Defendants.      )<br> | C.A. No. 07cv753 (PLF) |

## AFFIDAVIT OF JEFFREY GREEN

Under the pains and penalties if perjury I hereby affirm that the following is true and correct to the best of my knowledge and belief:

1.  I, Jeffrey Green, am an attorney in Lansing, Michigan.

2.  I represented Rebecca Marcus during the initial portion of Michigan State University's 1999 investigation into her alleged research misconduct.

3.  Rebecca Marcus informed me that on or about July 16, 1999, she filed a larceny report with the Michigan State University Department of Police.

4.  An August 2, 1999 Michigan State University Department of Police Supplemental Report states that I contacted Officer Zezulka by telephone on July 30, 1999.

5.  This August 2 Supplemental Report states that I advised Officer Zezulka that "Rebecca [had] indicated that the larceny report [was] unfounded."

6.  This statement is untrue. I never advised Officer Zezulka, nor anyone else, that Rebecca Marcus had asserted that the larceny report was unfounded.

7.  The conversation I had with the Michigan State University Department of Police was for the purpose of withdrawing Rebecca Marcus' criminal complaint in order to pursue it elsewhere; it had nothing to do with any lack of foundation for the report.

Dated:  October 26, 2007

Jeffrey Green

# PL.'S EXHIBIT 3

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**DEPARTMENTAL APPEALS BOARD**
**CIVIL REMEDIES DIVISION**

_____
                                        )
Office of Research Integrity,           )
U.S. Department of Health and Human Services,  )
                                        )
v.                                      )        Docket No.: C-07-32
                                        )
Rebecca Uzelmeier                       )        Date:  October 30, 2006
                                        )
                       Respondent.      )
_____)


**MOTION TO DISMISS ORI'S PROPOSED DEBARMENT OF REBECCA UZELMEIER**
**OR IN THE ALTERNATIVE MOTION FOR LEAVE TO FILE SUPPLEMENTATION**
**OF THE HEARING REQUEST**

On September 6, 2006, Mrs. Rebecca Uzelmeier received notification from the

Department of Health and Human Services (DHHS), Office of Public Health and Science

(OPHS) Office of Research Integrity (ORI) that ORI "is proposing finding of misconduct in

science against [her] based upon accumulated evidence including the Michigan State University

(MSU) investigation report (MSU Report), dated March 5, 2002, and additional analysis and

information obtained by ORI during its oversight review of the MSU Report."  According to the

notice, the Debarring Official in DHHS "who is authorized to impose debarment has reviewed

these findings and finds that this misconduct in science is a cause for debarment under 45 C.F.R.

§ 76.800(d)," which permits DHHS to debar a person for "cause of so serious of compelling a

nature that it *affects your present responsibilities*." 45 C.F.R. § 76.800(d) (emphasis added).

As a result of the findings, the Debarring Official proposed debarring Mrs. Uzelmeier for

a period of five (5) years.  Pursuant to 42 C.F.R. §§ 93.500 and 93.501, Mrs. Uzelmeier had

only thirty (30) days to contest the proposed findings and administrative actions by requesting an administrative hearing.

Mrs. Uzelmeier filed a timely request for an administrative hearing.

For reasons set forth below, ORI's proposed debarment should be dismissed. In the alternative, good cause exists for granting Mrs. Uzelmeier leave to file a supplemental hearing request pursuant to 42 C.F.R. 93.501(d).

## I.     THE DEBARRING OFFICIAL'S REQUEST TO DEBAR MRS. UZELMEIER SHOULD BE DISMISSED

According to the Federal Acquisition Regulations System (FAR), the decision to debar is discretionary *see* 48 C.F.R. § 9.402(a). Because of its serious nature, debarment may "be imposed only in the public interest for the Government's protection and not for purposes of punishment." 48 C.F.R. § 9.402(b); *United States v. Glymph*, 96 F.3d 733 (1996).

In addition, "[t]he existence of a cause for debarment . . . does not necessarily require that the contractor be debarred; the seriousness of the contractor's acts or omissions and any mitigating factors should be considered in making any debarment decision." 48 C.F.R. § 9.406-1(a). In any debarment action, the cause for debarment must be established by a preponderance of the evidence, with the burden falling on the agency proposing debarment. 48 C.F.R. § 9.406-3(d)(3). In other words, ORI has the burden of demonstrating that Mrs. Uzelmeier constitutes an actual or potential threat that so "compelling" in nature as to "affect" her "present responsibilities." 45 C.F.R. § 76.800(d).

The FAR also commands Agencies to "establish procedures for the prompt reporting, investigation, and referral to the debarring official of matters appropriate for that official's consideration." 48 C.F.R. § 406-3. DHHS has established such procedures, and they can be

found at 42 C.F.R. Part 93. Like the FAR, DHHS's regulation also states that the "[t]he purpose of HHS administrative actions is remedial." 42 C.F.R. § 93.408. According to the rule, "the appropriate administrative action is commensurate with the seriousness of the misconduct, and the need to protect the health and safety of the public . . . ." *Id.* However, the FAR states that a "[d]ebarment shall be for a period commensurate with the seriousness of the causes(s). Generally, a debarment should not exceed 3 years . . . ." FAR § 9.406-4(a)(1). However, a longer period of debarment will be justified in cases where circumstances warrant 48 C.F.R. § 406-4(b). As set out above, the Debarring Official in this case proposed debarring Mrs. Uzelmeier for a period of five years.

Presumably the Debarring Official in this case ignored section 93.408, which provides for mitigating and aggravating factors for Debarring Officials to consider in DHHS debarment actions. *See id.* For example, debarment official should ask: "Is the respondent *presently responsible* to conduct PHS supported research?" 42 C.F.R. § 93.408(g) (emphasis added). This mitigating question is especially appropriate in this case.

As set forth below, two grounds exist for dismissing ORI's claims against Mrs. Uzelmeier. First, Mrs. Uzelmeier does not constitute any threat to HHS as an actual or potential contractor. Because she is not now, and does not intend to be, responsible for any federally funded program, let alone responsible for PHS supported research, debarment is not appropriate in this case.

Additionally, based on the delay in filing for debarment, this case is now time barred and/or "stale," and must be dismissed. Had ORI truly believed that Mrs. Uzelmeier constituted a real threat to engage in inappropriate contracting-practices, ORI would have moved to suspend

or debar Mrs. Uzelmeier years ago.  Instead, ORI waited seven years to commence this action.
As set forth below, ORI waited to long.

      This case concerns allegations raised by MSU against a former graduate student.  The
graduate student was never permitted to complete her education and was not awarded her Ph.D
Degree.  Her career in science was effectively destroyed in 1999.  She currently does not work in
science-related areas and has no intent to work as a scientist.  Since 1999 (and before) she has
not applied for any government grants or contracts, and has no intent to apply for such grants or
contracts.  She is not a federal contractor and she has no interest whatsoever in becoming a
federal contractor.  She was never a "principal investigator" and has no intent of ever becoming a
"principal investigator."  Mrs. Uzelmeier never applied for or received a government grant.  Mrs.
Uzelmeier has no intention whatsoever of applying for or working on a project supported by a
government grant or contract, and she has no interest or intent on ever being involved with any
DHHS committees or projects.

      After MSU refused to permit Mrs. Uzelmeier permission to have independent scientific
experts access to the evidence against her, Mrs. Uzelmeier terminated her academic career.
Since that time she married, has a three year old child and took a job in non-science related areas.

      Mrs. Uzelmeier has never been indicted or convicted of any criminal charges.   ORI now
concedes that, despite of all the accusations submitted against her, she is not even the target of a
criminal inquiry.  She was not expelled from any university and she has never had the
opportunity to contest any of the allegations made against her in a contested case proceeding
governed by proper due process of law.   After having her academic/scientific career destroyed at
MSU, she has not been accused of any ethical violations and she has not been charged with any

crimes. To the best of her knowledge, she has not even been investigated for any criminal conduct whatsoever.

Mrs. Uzelmeier has already been effectively debarred for seven years (i.e. 1999-2006), and has been repeatedly punished based on the allegations raised by MSU. She has suffered significant financial loss, the destruction of her career in science, emotional distress, loss of reputation, the payment of attorney fees and costs and stress related to the constant threat that the United States would take action to "debar" her and consequently create a public record that would harm her in her non-government/non-scientific/non-federal contracting related work. In other words, because Mrs. Uzelmeier is not a "threat" to seek government grants or contracts, the only impact her debarment would have would be to further punish her and/or interfere with her ability to obtain other employment and to forever destroy her reputation, based solely on allegations of misconduct she purportedly committed while a graduate student.

Additionally, ORI's complaint against Mrs. Uzelmeier is "stale" and untimely. The events which led to this debarment proceeding occurred 7 years ago while Mrs. Uzelmeier was a graduate student at MSU. As set forth above, given the nature of the MSU allegations, the allegations had the effect of destroying Mrs. Uzelmeier's career in science and effectively resulted in the semi-permanent debarment of Mrs. Uzelmeier (i.e. she changed careers and no longer works in areas related to government contracting or science). MSU failed to complete its investigation within the regulatory time period. ORI was aware of the allegations as of 1999, but waited 7 years to initiate a debarment action. Clearly, if ORI thought that Mrs. Uzelmeier was a "current threat" to the government, they would have moved to suspend her as a contractor and/or debar her has a contractor years ago. Instead, by waiting 7 years they tacitly (and correctly)

acknowledge that she has not and does not currently pose a sufficient threat as a contractor or potential contractor/grant recipient, so as to justify debarment.

As noted in the  American Bar Association, Section of Public Contract Law, Committee on Debarment and Suspension's book, *The Practitioner's Guide to Suspension and Debarment* (Third Edition, 2002) (hereinafter, "*ABA Guide*"), regardless of whether a statute of limitations applies to a debarment case, a case can still be dismissed due to the passage of time:

> **[T]he issue of passage of time can give rise to a 'staleness argument, where the offending conduct occurred so far in the past that it has little, if any, bearing on 'present responsibility.'**

*ABA Guide*, p. 195.

In this case, the passage of time clearly occurred so far in the past that debarment would have little, if any bearing on "present responsibility."  If Mrs. Uzelmeier had attempted to remain in academia; if she had attempted remain a viable applicant for PHS funds; if she had attempted to become a federal contractor; if she had completed her degree and thus had professional credentials and/or licenses that would realistically qualify her to work as a principle investigator, then perhaps ORI could meet the "present responsibility" threshold.  However, over the seven years which has elapsed since the allegations against Mrs. Uzelmeier first surfaced, the facts are now clear and uncontested – the passage of time demonstrates that the debarment proceeding is stale.

Moreover, regardless of whether a specific statute of limitations governs this proceeding, the policy grounds which underlie such limitations clearly apply to this case.  The facts are stale. The memory of all of the witnesses has faded.  The delay resulting from MSU's failure to

complete its investigation in a timely manner, and the long delay in ORI's instituting a

debarment proceeding, harmed Mrs. Uzelmeier's ability to create a timely or complete record.

ORI's request to debar Mrs. Uzelmeier constitutes improper punishment. The complaint

against Mrs. Uzelmeier violates the requirements of 48 C.F.R. 9.402(b) and must be dismissed.

Debarring Mrs. Uzelmeier does not protect the government or serve the public interest. Given

Mrs. Uzelmeier's change in career path, and the amount of time that has transpired between the

alleged misconduct and ORI's request to debar Mrs. Uzelmeier, the failure to promptly dismiss

this proceeding will result in the punishment of Mrs. Uzelmeier.

The standards governing debarment actions were applied *Roemer v. Hoffmann,* 419

F.Supp. 130 (D.D.C. 1976). In that case, a manufacturer's representative was convicted of

wrongly accepting money. He was debarred for a period of only three years. The court set aside

the debarment, holding that the agency failed to consider evidence having a tendency to diminish

the impact of the conviction on the contractor's present responsibility. The *Roemer* court's

analysis of present responsibility was properly focused on the seriousness of the offense, the

length of time that had passed since the offense, and the contractor's conduct in the interim. Had

HHS applied these same principles, Mrs. Uzelmeier should not have been found to be presently

responsible.

This point, as to whether a contractor is "presently responsible," is clearly consistent with

the concerns raised by the drafters HHS's current debarment regulations, which now explicitly

contain a statute of limitations.  The drafters "propose[d] to limit the score of the misconduct

regulation to cases in which the alleged misconduct occurred within 6 years before the

allegation."  69 FR 20778-01, at 20785.  According to the drafters, the reason for establishing a

"limitations period" was their recognition "of the problems that may occur in investigating older

7

allegations and the potential unfairness to accused researchers in defending against them . . . ." *Id*.  In fact, administrative debarments were created to exclude individuals or entities from eligibility for grant and contract awards from the federal government for a specified period of time.  DAB No. 1409 (1993), 1993 WL 742594 (H.H.S.).

The Department of Education's regulation regarding the period of debarment is the same as the Department of Health and Human Services regulation regarding the period of debarment. 34 C.F.R. § 85.865; 45 C.F.R. § 865.  These regulations provide that "[g]enerally, debarment should not exceed three years." *Id*.  While the Department of Health and Human Services has not commented on the reasons behind the three year limit, the Department of Education has explained:  "the line of demarcation between the protection of the public interest and punishment is generally three years. . . . even in the most outrageous situations, a debarred is considered fit to do business with the Federal government upon the expiration of the debarment period absent any new, significant transgressions." *In the Matter of the Proposed Debarment of Nelson Murray*, Docket No. 96-43-DA (United States Department of Education Office of Hearings and Appeals 1996).

In *Murray*, the Department of Education Office of Hearings & Appeals denied the proposed debarment on the basis that the proposed debarment action had not been timely prosecuted. *Id*. at 8.  In *Murray*, the debarment action was instituted "some four years after his conviction and six months after Mr. Murray would have been considered, once again, fit to conduct business with the Federal government if he had been debarred in a timely fashion." *Id*. The *Murray* court found that "[t]his four-year delay transforms an otherwise act for the protection of the public interest into a form of punishment and violates the fundamental principle underlying a debarment proceeding.  Such a situation cannot be condoned." *Id*.  *See also David*

*K. Alberta*, AGBCA No. 93-189-7 (Department of Agriculture Board of Contract Appeals 1994) ("Since no specific time is stated [in the regulations], we find that referral [for debarment] must be made within a **reasonable time** of when the cause for debarment allegedly occurred.") (emphasis added); *Roemer v. Hoffman*, 419 F.Supp. 130, 132 (remanded to the decision-maker for consideration of mitigating factors, including the length of time which has passed since the offense).

Consistent with *Murray,* this Board should dismiss the ORI complaint.

## II. GOOD CAUSE EXISTS FOR GRANTING MRS. UZELMEIER'S MOTION FOR LEAVE TO FILE A SUPPLEMENTAL HEARING RQUEST.

Should this Board not grant Rebecca Uzelmeier's motion to dismiss, Mrs. Uzelmeier respectfully requests leave of the Board to file a supplemental hearing request within thirty days of receipt of the complete administrative record from ORI. 42 CFR 93.501(d)(1). As set forth below, good cause exists for granting this request. 42 CFR 93.501(d)(2).

Under the controlling regulations, Mrs. Uzelmeier may obtain leave to file a "supplementation of the hearing request" so as to permit her request to "fully comply with the requirements" set forth in the relevant HHS regulations, if "good cause" exists for granting such a motion. According to 42 CFR 93.501(d)(2), "Good cause means circumstances beyond the control of the respondent or respondent's representative and not attributable to neglect or administrative inadequacy." As set forth below, good cause exists for granting this motion.

First, Mrs. Uzelmeier has not yet received the complete administrative record upon which her ORI's request is based. Although ORI produced a copy of a report drafted by MSU, and some documents which purport to be the results of some scientific analysis, ORI has *not* produced the complete record it relied upon to propose Mrs. Uzelmeier's debarment. Additionally, the record relied upon by MSU to support its report have not been produced.

9

Moreover, ORI, in its complaint, admits that some documents upon which it relies upon for its request to debar Mrs. Uzelmeier, have *never* been provided to the respondent. *See, e.g.* ORI paragraphs 153 and 155.

It is well established that a respondent should have access to the *complete* administrative record prior to having to submit his or her final request for a hearing. For example, the ABA Committee on Debarment and Suspension noted, in the *ABA Guide,* that, in preparing a request for a hearing, "an important first step for the respondent is to discover the basis for the agency's action by requesting a copy of the evidence relied upon by the suspending or debarring official in making the determination (the 'administrative record.')." *ABA Guide,* p. 75. The Committee went on to note that there were only "limited circumstances" such as an "ongoing criminal investigation" that "might" justify the agencies failure to produce such a record. *Id.* In this case ORI has now conceded that there are no ongoing criminal investigations, and thus there is no reason whatsoever that ORI cannot immediately produce the complete record relied upon by ORI to justify the debarment. This would include all of the work produce which both the MSU investigatory report and the ORI investigatory findings are based.

The fact that Mrs. Uzelmeier does not have access to the complete administrative record is clearly "beyond the control of the respondent." Those documents are in the possession or control of ORI and ORI has not provided them to Mrs. Uzelmeier. Furthermore, Mrs. Uzelmeier did not neglect this matter. Shortly after obtaining notice of the proposed debarment, Mrs. Uzelmeier promptly requested access to the complete administrative record from ORI. HHS/ORI refused to produce any of these documents, and asserted in response to one request filed on behalf of Mrs. Uzelmeier that the Freedom of Information Act could not be used to obtain the information, as the material was part of an open ORI investigation. Thus, Mrs.

Uzelmeier did not "neglect" this matter. She promptly requested access to the information. ORI did not voluntarily produce the information, but instead advised that the FOIA should be utilized. When Mrs. Uzelmeier utilized the FOIA, she was then advised that the documents were subject to the investigatory exemption. *See,* e.g. September 29, 2006 letter from Darlene Christian to Stephen Kohn, attached hereto.[1]

Second, as set forth in Mrs. Uzelmeier's initial request for a hearing, she was reluctant to provide specific responses because ORI set forth allegations against her which were criminal in nature. Since filing that request, ORI has now conceded that Mrs. Uzelmeier was clearly within her rights to "assert her privilege against self-incrimination." ORI Motion to Dismiss, p. 7. However, ORI has now clarified that, to the best of their knowledge, despite the hyperbole in their complaint, ORI has "not referred" Mrs. Uzelmeier for "prosecution." This is a very significant statement by ORI, as the case law clearly indicates that the United States can be

---

[1] Counsel for Mrs. Uzelmeier also notes that ORI contends that an enlargement of time to file supplemental request for a hearing is not justified because the undersigned counsel represented Mrs. Uzelmeier in settlement negotiations. Although Mrs. Uzelmeier objects to the introduction into the record of any facts related to any alleged settlement discussions, counsel will confirm that the undersigned firm was retained for the limited purpose of attempting to resolve this matter. This representation did not consist of representing the respondent in a debarment proceeding or substantively responding to the allegations raised by ORI. Specifically, during the MSU investigation Mrs. Uzelmeier was represented by a firm in Okemos, MI. Immediately upon receiving notice that ORI had filed a debarment action, counsel for Mrs. Uzelmeier insured that the proper waivers and permissions were promptly obtained by Mrs. Uzelmeier's former attorneys, so that the case files related to the MSU investigation – that had been closed for *years* – could be sent to Mrs. Uzelmeier's current attorneys. These files were not received by Mrs. Uzelmeier's current attorneys until October 6, 2006. *See,* Attached Federal Express Airbill. Additionally, because ORI had not communicated with Mrs. Uzelmeier's current attorneys for nearly one year prior to filing for debarment – Mrs. Uzelmeier's current attorneys had effectively closed her case, and presumed that ORI had no interest in filing for debarment. However, once ORI's filing was made, Mrs. Uzelmeier promptly retained counsel to contest the debarment proceeding, signed the proper waivers to insure delivery of the case file to her new attorneys, and otherwise facilitated the receipt of the old MSU-investigation litigation file. That file was not complete, inasmuch as MSU did not produce its entire administrative record during its investigation.

11

prohibited from using evidence obtained in a civil proceeding if it "failed to advise the defendant

in its civil proceeding that it contemplates his criminal prosecution."    *U.S. v. Kordel,* 397 U.S.

1, 12 (1970).  Based on these representations, and the fact that despite accusing Mrs. Uzelmeier

of criminal misconduct, ORI has admitted that it has not even referred this matter for

prosecution, good cause exists to permit Mrs. Uzelmeier leave to file a supplemental request for

a hearing.

Third, in Mrs. Uzelmeier's initial request for a hearing, Mrs. Uzelmeier informed this

Board that, if ORI's request to debar her was not dismissed, she would need additional time to

file a supplemental hearing request.  These grounds are hereby incorporated herein, and

constitute good cause for leave to file a supplemental request for a hearing.

For example, Mrs. Uzelmeier contents that the entire ORI filing is based on evidence that

is not admissible under either hearsay rules or *Daubert*.  It would be fully appropriate for this

Board to initially rule as to wither ORI meets its initial burden of proof to justify a debarment,

and if such a burden was met, thereafter to require Mrs. Uzelmeier to respond to the specific

evidence admitted onto the record in light of the hearsay and *Daubert* objections.[2]

---

[2] In this regard, ORI has argued that it can meet its burden of proof simply by filing hearsay allegations.  *See,* ORI Motion to Dismiss, p. 8.  However, ORI has missed the point of the hearsay/*Daubert* objections filed by Mrs. Uzelmeier.  Although hearsay may be admissible in an administrative hearing, it is well settled that hearsay evidence alone cannot satisfy a party's burden of proof.  In other words, as a matter of administrative law, ORI must rely upon more evidence then just hearsay to meet its burden of proof under 42 C.F.R. 93.516(b).  This rule is well established.  For example, in *Consolidated Edison v. NLRB,* 305 U.S. 197, 230 (1938) (emphasis added),  the Supreme Court noted that although administrative agencies have "flexibility" in their procedures, that flexibility "does not go so far as to justify orders without" a proper "basis in probative evidence.  Thus, "uncorroborated hearsay" does "**not constitute substantial evidence.**"  Once ORI produces some non-hearsay testimony which, under oath, sets forth any valid grounds for debarring Mrs. Uzelmeier, then Mrs. Uzelmeier would be under a proper obligation to rebut the evidence.  However, under *Consolidated Edison,* mere hearsay evidence is not enough.  This argument ties directly back to the *Daubert* argument.  Once ORI produces a witness who can introduce non-hearsay evidence, inasmuch as that testimony

## CONCLUSION

For the reasons set forth above, ORI's request to debar Mrs. Uzelmeier should be dismissed.  In the alternative, Mrs. Uzelmeier should be granted leave to file a supplemental hearing request.

Respectfully submitted,


Stephen M. Kohn
Aaron Parness
KOHN, KOHN & COLAPINTO, LLP.
3233 P Street, N.W.
Washington, DC 20007
Phone: (202) 342-6980
Fax: (202) 342-6984
Attorneys for Mrs. Uzelmeier


Date: October 30, 2006

---

attempts to introduce scientific evidence into the record, that testimony would have to meet the *Daubert* standard to be admissible.  Additionally, without some attempt to meet its burden under *Daubert,* so-called "expert" scientific opinions cannot be introduced into evidence.  A *Daubert* analysis is critical in order for this Board to properly weigh the evidence and insure that the "danger of unfair prejudice" is not implicated by ORI attempting to introduce expert opinions into evidence, via hearsay testimony which has not be examined in light of *Daubert.*   In this regard, the hearsay evidence, as set forth by ORI, does not contain any facts or opinions (even hearsay facts or opinions) which demonstrates reliability under *Daubert* and thus constitutes admissible evidence.  Consequently, that evidence must be excluded under controlling case law and 42 C.F.R. 93.519(c).

SERVICE BY FAX AND FRIST CLASS MAIL ON:

Honorable Carolyn Cozad Hughes
Administrative Law Judge
Attn: Andrea M. Selzer, Staff Attorney
Departmental Appeals Board
Department of Health and Human Services
MS 6132
330 Independence Ave., S.W.
Cohen Building, Room 6-G-644,
Washington, DC 20201
Fax: 202-565-0225

Brian D. Bewley
Chris B. Pascal. J.D.
Director
Office of Research Integrity
1101 Wootton Parkway, Suite 750
Rockville, MD 20852-5003
Fax 301-443-2639

# PL.'S EXHIBIT 4



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Program Support Center

Division of FOIA Services
Administrative Operations Service
Parklawn Building, Room 17A-46
5600 Fishers Lane
Rockville, Maryland 20857
PH: 301-443-5252
Fax: 301-443-0925

FOIA Case Number: PHS2K6-509D
September 29, 2006

Mr. Stephen M. Kohn
3233 P Street, NW
Washington, D.C. 20007

Dear Mr. Kohn:

This is in response to your September 14 email addressed to Mr. Brian
Bewley, Health and Human Services, Office of the General Counsel. On
behalf of your client, Rebecca Uzelmeier, you requested a copy of NIH
Grant R01 ES02520 and a copy of the July 15, 1999 Michigan State
University Police Department Incident Report. You also requested all
documents referenced in a September 6, 2006 letter to your client, as
well as a WordPerfect and/or Microsoft Word copy of the September 6,
2006 letter. Your request was referred to me because of my
responsibilities under the Freedom of Information Act (FOIA).

The Department's policy calls for the fullest responsible disclosure
consistent with the requirements of administrative necessity and
confidentiality which are recognized by the FOIA (5 U.S.C. 552), and the
Department's implementing Public Information Regulations (45 CFR
Part 5). Copies of the Act and Regulations are enclosed and referred to
below.

The records at issue in your request are part of an open investigation.
As such, release of information at this time could reasonably be expected
to interfere with ongoing proceedings. Therefore, I must deny you access
to the requested records. Also, I am denying your request for a copy of
the September 6, 2006 letter and accompanying documents in a Word or
WordPerfect format. Such formats would permit the unauthorized
manipulation of the records and circumvent the agency's requirements to
ensure that final agency documents are not, upon release, revised or
changed.

Exhibit 4
2

Page 2 – Mr. Stephen M. Kohn

My decision to withhold the information is based upon the FOIA, 5 U.S.C. 552(b)(2) and (b)(7)(A), and the Department's implementing Public Information Regulations, see 45 CFR 5.63 and 5.68(a).

You, of course, have the right to appeal this decision to deny you access to records in this agency's possession. Should you wish to do so, send your appeal, within 30 days from the date you receive this letter, to the Deputy Assistant Secretary for Public Affairs (Media), U.S. Department of Health and Human Services, Room 17A-46, 5600 Fishers Lane, Rockville, Maryland 20857, following the procedures outlined in Subpart C of the enclosed Regulations. Please mark both your appeal letter and envelope "FOIA Appeal".

Because the cost of responding to your request was less than $25, there is no charge.

Sincerely yours,

Darlene Christian
Director
Division of FOIA Services

Enclosures

Exhibit 4
3

**From:** Stephen M. Kohn [mailto:smk@kkc.com]
**Sent:** Thursday, September 14, 2006 4:42 PM
**To:** Bewley, Brian (HHS/OGC)
**Subject:** RE: Request for electronic version of Charge Letter

Dear Brian:  Please consider this email a formal request under the Privacy Act for the immediate production all documents referenced in the charge against Rebecca Uzelmeier, dated September 6, 2006, but which were not attached to said charge.  This includes, but is not limited to, the following documents referenced in the charge, but which were not attached:

   1.    A copy of NIH Grant R01 ES02520

   2.    A copy of the July 15, 1999 Michigan State University Police Department Incident Report.

        Thank you for your prompt attention to this matter.  Please be advised that there is no exhaustion requirement under the Privacy Act regarding the production of documents covered under said Act, and if the requested documents are not produced within three working days, a Privacy Act disclosure lawsuit may be initiated.  These documents are clearly within the direct control of your office, and can be made immediately available.

        Thank you.  Stephen Kohn,  Attorney for the Rebecca Uzelmeier

***Important  Notice.  Please Carefully Review:*** This e-mail transmission (and any and all attachments) is intended only for the personal and confidential use of the recipient(s) designated above. This e-mail (including any and all attachments) contains strictly confidential attorney-client communications and/or attorney work product and is legally privileged. If you are not the intended recipient of this communication (or an agent responsible for delivering it to the intended recipient), you are hereby notified that any review, disclosure or use of the information contained herein (including any and all attachments) is Strictly Prohibited. If you have received this communication in error, please notify us by telephone, at 202-342-6980, or by return e-mail, immediately. Also, to ensure compliance with requirements imposed by the IRS, we inform you that, unless expressly stated otherwise, any advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.Thank you.

Exhibit 4
4

## Stephen M. Kohn

| | |
|---|---|
| **From:** | Stephen M. Kohn |
| **Sent:** | Tuesday, September 19, 2006 11:53 AM |
| **To:** | 'Bewley, Brian (HHS/OGC)' |
| **Subject:** | RE: Request for electronic version of Charge Letter |

Dear Brian:  Please provide me with a copy of the complete administrative record relied upon by the HHS as the basis for filing the debarment charge against Rebecca Uzelmeier.  Please provide this information as quickly as possible.

Thank you.  Stephen Kohn,  Attorney for the Rebecca Uzelmeier

*Important  Notice.  Please Carefully Review:* This e-mail transmission (and any and all attachments) is intended only for the personal and confidential use of the recipient(s) designated above. This e-mail (including any and all attachments) contains strictly confidential attorney-client communications and/or attorney work product and is legally privileged. If you are not the intended recipient of this communication (or an agent responsible for delivering it to the intended recipient), you are hereby notified that any review, disclosure or use of the information contained herein (including any and all attachments) is Strictly Prohibited. If you have received this communication in error, please notify us by telephone, at 202-342-6980, or by return e-mail, immediately. Also, to ensure compliance with requirements imposed by the IRS, we inform you that, unless expressly stated otherwise, any advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.Thank you.

Stephen M. Kohn
3233 P St. NW
Washington, DC 20007
202 342-6980
202 342-6984 (Fax)

*Important  Notice.  Please Carefully Review:* This e-mail transmission (and any and all attachments) is intended only for the personal and confidential use of the recipient(s) designated above. This e-mail (including any and all attachments) contains strictly confidential attorney-client communications and/or attorney work product and is legally privileged. If you are not the intended recipient of this communication (or an agent responsible for delivering it to the intended recipient), you are hereby notified that any review, disclosure or use of the information contained herein (including any and all attachments) is Strictly Prohibited. If you have received this communication in error, please notify us by telephone, at 202-342-6980, or by return e-mail, immediately. Also, to ensure compliance with requirements imposed by the IRS, we inform you that, unless expressly stated otherwise, any advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.Thank you.

Stephen M. Kohn
3233 P St. NW
Washington, DC 20007
202 342-6980
202 342-6984 (Fax)

Exhibit 4
5

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                                )
REBECCA UZELMEIER,                              )
                                                )
                              Plaintiff,         )
                                                )
              v.                                 )        C.A. No. 07cv753 (PLF)
                                                )
UNITED STATES DEPARTMENT OF                     )
HEALTH AND HUMAN SERVICES, *et al.*)
                                                )
                         Defendants.             )
_____)

## **ORDER**

        UPON CONSIDERATION of Defendants' Motion to Dismiss or, in the
Alternative, for Summary Judgment dated August 20, 2007, and Plaintiff's Motion for
Partial Summary Judgment dated November 7, 2007, and all papers and arguments in
support thereof, and in response thereto, and the entire record therein, it be and hereby is

        ORDERED that Defendants' Motion to Dismiss or, in the Alternative for
Summary Judgment is DENIED, and it is

        ORDERED that Plaintiff's Motion for Summary Judgment on Counts 2, 3, and 4
is GRANTED, and it is

        ORDERED that Defendants produce a proper *Vaughn* Index within thirty days of
this Order, and it is

        FURTHER ORDERED that HHS is directed to vacate the debarment of Rebecca
Uzelmeier and expunge the record of references to said debarment.

        IT IS SO ORDERED.


_____          _____
Date                                              HON. PAUL L. FRIEDMAN
                                                     United States District Judge